**SYLVANIA ELECTRIC PROD-
UCTS, INC.**

v.

**The UNITED STATES.**

No. 378–70.

United States Court of Claims.
June 20, 1973.

Allan J. Joseph, San Francisco, Cal., for plaintiff. Walter F. Pettit, San Francisco, Cal., attorney of record for plaintiff. Sidney J. Cohen, San Francisco, Cal., Haig J. Shalvarjian, Mountain View, Cal., and Miller, Groezinger, Pettit, & Evers, San Francisco, Cal., of counsel.

Leslie H. Wiesenfelder, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG, and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KUNZIG, Judge:

This is a contract action wherein this court, by cross motions for summary judgment, has been asked to review a decision of the Armed Services Board of Contract Appeals (the Board)[1] in accordance with the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970).

---

1. Sylvania Electric Products, Inc., 70–2 BCA ¶ 8387.

In issue is whether the Board's decision that the Government is entitled to a price reduction of $239,913.75 pursuant to the Defective Pricing Clause of the contract [2] is supported by substantial evidence and is correct as a matter of law.

We affirm the Board's excellent decision in favor of the Government. We hold the conclusions of the Board withstand a Wunderlich Review:

I. The plaintiff-contractor failed to *disclose* accurate, complete and current cost and pricing data.

II. The data not disclosed involved *significant sums*.

III. The Government *relied* upon the inaccurate data thus establishing a *causal relationship* between the incorrect data and the final negotiated contract price.

These conclusions of the Board involved mixed questions of law and fact. We do not deem it necessary to attempt to distinguish the two, since final disposition of this case does not require such delineation.

On April 30, 1964, plaintiff-contractor responded to a previously issued Request for Proposal (RFP) for the production of the electronic's portion of two special receiving sets. Plaintiff quoted a firm fixed price of $6,385,325. On October 2, 1964, the last day of the negotiations, plaintiff executed the required Certificate of Cost and Pricing Data. It provided:

(i) complete cost and pricing data, current as of 30 April 1964, has been considered in preparing Sylvania Proposal 300–PR–03 and submitted to the

---

**2.** This contract clause has been added to government contracts pursuant to the Truth in Negotiations Act, 10 U.S.C. § 2306(f) (1970), which reads:

"A prime contractor or any subcontractor shall be required to submit cost or pricing data under the circumstances listed below, and shall be required to certify that, to the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete and current—

"(1) Prior to the award of any negotiated prime contract under this title where the price is expected to exceed $100,000;

"(2) Prior to the pricing of any contract change or modification for which the price adjustment is expected to exceed $100,000, of such lesser amount as may be prescribed by the head of the agency;

"(3) Prior to the award of a subcontract at any tier, where the prime contract and each higher tier subcontractor have been required to furnish such a certificate, if the price of such subcontract is expected to exceed $100,000; or

"(4) Prior to the pricing of any contract change or modification to a subcontract covered by (3) above, for which the price adjustment is expected to exceed $100,000, or such lesser amount as may be prescribed by the head of the agency.

"Any prime contract or change or modification thereto under which such certificate is required shall contain a provision that the price to the Government, including profit or fee, shall be adjusted to ex-

clude any significant sums by which it may be determined by the head of the agency that such price was increased because the contractor or any subcontractor required to furnish such a certificate, furnished cost or pricing data which, as of a date agreed upon between the parties (which date shall be as close to the date of agreement on the negotiated price as is practicable), was inaccurate, incomplete, or noncurrent: *Provided*, That the requirements of this subsection need not be applied to contracts or subcontracts where the price negotiated is based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities to the general public, prices set by law or regulation or, in exceptional cases where the head of the agency determines that the requirements of this subsection may be waived and states in writing his reasons for such determination.

"For the purpose of evaluating the accuracy, completeness, and currency of cost or pricing data required to be submitted by this subsection, any authorized representative of the head of the agency who is an employee of the United States Government shall have the right, until the expiration of three years after final payment under the contract or subcontract, to examine all books, records, documents, and other data of the contractor or subcontractor related to the negotiation, pricing, or performance of the contract or subcontract."

Contracting Officer or his representative;

(ii) all significant changes in the above data which occurred since the aforementioned date through 2 October 1964 have been similarly submitted; and no more recent significant change in such data was known to the undersigned at the time of executing this certificate; etc.

(iii) all data submitted are accurate.

Final price negotiations were held between September 28, 1964 and October 2, 1964, based upon plaintiff's submissions. At the outset, the parties were approximately $3,000,000 apart. After many changes in their respective positions, they differed by only about $600,000. It was mutually agreed to split the difference, which resulted in a final contract price of $4,614,000.

In 1966, as a result of events not relevant to this case, the General Account-ing Office (GAO) opened an inquiry into plaintiff's compliance with the Truth in Negotiations Act. The GAO found that the contract price of $4,614,000 had been increased by significant sums because plaintiff had failed to disclose to the Government accurate, complete and current cost and pricing data. The GAO report further found that proper disclosure before final price negotiations would have revealed plaintiff's use of incorrect quantities in computing the cost of some parts and components, and the use of non-current price quotations in computing the cost of others. On the basis of these findings, the GAO recommended that the Government seek a downward adjustment of $254,000 in the contract price. Accordingly, on August 28, 1968, the Air Force contracting officer ordered the contract price reduced by $254,304. This figure represented defective pricing under the Truth in Negotiations Act as follows:

|     |                                      |          |
| --- | ------------------------------------ | -------- |
| a.  | GPI Receivers (duplication)          | $104,752 |
| b.  | Cable (939) (lower quotations)       | 12,165   |
| c.  | Cable (216) (307) (lower quotations) | 10,173   |
| d.  | Adapters and Connectors (duplication)| 35,927   |
| e.  | Goniometers (lower quotations)       | 17,500   |
| f.  | Power Supply Units (lower quotations)| 18,820   |
| g.  | Rack Hardware (lower quotations)     | 15,636   |
|     | Total                                | 214,973  |

To this amount, 6% for general and administrative expense and 11.6% for profit, were added, giving a total of $254,304.

On appeal to the Board, the contracting officer's decision was upheld to the extent of $239,913.75.[3] Plaintiff subsequently sued for this figure, filing a petition in this court on November 3, 1970 and seeking a review of the Board's decision pursuant to the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970).

The instant contract contained a Defective Pricing Clause identical in content to ASPR § 7.104–29 in effect at the time of the contract and promulgated pursuant to the Truth in Negotiations Act. The clause reads in pertinent part:

(a) *If The Contracting Officer determines that any price, including*

---

3. The Board held that the plaintiff should recover as to the 939 Cable. Although the net effect of plaintiff's estimate turned out to be too high, it resulted from an agreement between the parties which overestimated the need for this cable. Ac-cordingly, the Board reduced the initial figure of $254,304 to $239,913.75 to compensate for recovery of the 939 Cable and its related general and administrative expenses and profit.

*profit or fee, negotiated in connection with this contract was increased by any significant sums because the Contractor*, or any subcontractor in connection with a subcontract covered by (c) below, *furnished incomplete or inaccurate cost or pricing data or data not current as certified in the Contractor's Certificate of Current Cost or Pricing Data then such price shall be reduced accordingly and the contract shall be modified in writing to reflect such adjustment.*

(b) Failure to agree on a reduction shall be a dispute concerning a question of fact within the meaning of the "Disputes" clause of this contract.

(c) The Contractor agrees to insert the substance of paragraphs (a) and (c) of this clause in each of his cost-reimbursement type, price redeterminable, or incentive subcontracts hereunder, and in any other subcontract hereunder in excess of $100,000 unless the price is based on adequate price competition, established catelog or market prices of commercial items sold in substantial quantities to the general public, or prices set by law of regulation. * * * (Emphasis added.)

Compliance or lack thereof with this provision raises three distinct issues:

I. Whether the plaintiff-contractor disclosed accurate, complete and current cost and pricing data?

II. Whether the disputed data qualified under the "significant sums" criteria?

III. Whether the Government sustained its burden of proof in showing that it relied upon the disputed data and that there was a subsequent causal relationship between the data and the increased negotiated contract price?

### I

#### Disclosure

■ The purpose of the Truth in Negotiations Act is to avoid situations in which inaccurate, incomplete, or noncurrent information is known by the contractor, but withheld from the Government to its detriment. Cutler-Hammer, Inc. v. United States, 189 Ct.Cl. 76, 84, 416 F.2d 1306, 1311 (1969). Judge Durfee clearly held in *Cutler-Hammer* that current and accurate information, if known, must be furnished. He reiterated this point in Lockheed Aircraft Corp. v. United States, 193 Ct.Cl. 86, 432 F.2d 801 (1971), when he stated that the only way to further the purpose of the statute is to require *complete disclosure* of actual costs known to the contractor.

■■ In the instant action, there is substantial evidence to warrant the Board's conclusion that, as to all but one of the items listed in the GAO report [4], the contractor was aware of the accurate figures prior to or during price negotiations, yet failed to inform the Government. This we consider to be nondisclosure in violation of the Defective Pricing Clause of the contract and the Truth in Negotiations Act.

As to the following items, the evidence is clear that plaintiff had knowledge prior to the price negotiations of October 2, 1964 of lower quotations, yet failed to fully disclose them:

*Rack Hardware*—Plaintiff's supplier lowered prices to plaintiff on September 15, 1964. This was acknowledged by plaintiff by issuing a purchase order on September 18, 1964. The information was not transmitted to the contractor's negotiating team that was meeting with the government representatives.

*Power Supply Units*—Plaintiff received a lower quotation from supplier's successor on September 10, 1964. Although a new subcontract was not awarded until November, plaintiff knew before the negotiating sessions with the Government that it had no choice but to award the subcontract to this supplier.

*Cables RG 216 and 307/u*—There was no question that early in May 1964,

4. *Id.*

plaintiff received lower price quotations for the quantities needed and did not incorporate them in its proposal.

*Goniometers*—On or about August 13, 1964, plaintiff gained a price reduction because it negotiated the purchase of an increased quantity to satisfy other contracts, and failed to notify the Government.

■ Plaintiff specifically argues as to the *Rack Hardware* data and the *Power Supplirs* data that the information was not "reasonably available". Plaintiff admits that the new information regarding the Rack Hardware was known to a branch of plaintiff-corporation approximately one week before the negotiating sessions, but that it takes "approximately thirty to thirty-seven days" for this information to make its way to the firm's negotiators. This position we find untenable, even ludicrous. A simple telephone call could have obviated the situation. Plaintiff attempts, equally unsuccessfully, to raise the same defense (not reasonably available) as to lower prices for Power Supply Units. The excuse for failure to disclose the new information in this instance relates to alleged unfinished evaluation of plaintiff's proposed supplier. However, the Board found this to be a lame excuse indeed. The competitive situation of the moment gave plaintiff no choice but to award supplier the contract. We agree. When a contractor is considering using a lower quotation, that possibility should be reported to the Government. Cutler-Hammer, Inc. v. United States, *supra* 189 Ct.Cl. at 89, 416 F.2d at 1314. Thus as to both of these items there is substantial evidence to support the Board's conclusion that the data was reasonably available.

Regarding the *Goniometers*, the Board's conclusion that the Government was never informed of the price reduction is supported by substantial evidence. The contractor obtained a lower quotation from its supplier because of an increase in the quantity ordered to satisfy another government contract. It was regarding this second, unrelated contract, that the contractor quoted the correct figures to the Government. The contractor argues that, having told the Government about the lower price of the second contract, the Government should have known that this related to the instant contract also. This argument we cannot accept.

■ Plaintiff similarly contends that it "more than likely" did inform the Government of a lower price quotation for the *RG 216* and *307 Cables*. The Board found that the government estimator did not recheck the figures after the initial proposal and thus the government negotiators were not aware of the lower quotations. The estimator should not have to specifically and continuously recheck on a daily basis every figure submitted. The contractor, if there is a new quotation, must clearly and specifically disclose it.

Thus as to the Cables 216 and 307 and the Goniometers, we similarly affirm the Board's findings.

■ As to the *Adaptors and Connectors* and the *GPI Receivers,* the Board found that the incorrect data resulted from duplications of the quantities required. Plaintiff admits that it mistakenly doubled the quantity of the Adaptors and Connectors, but contends that data furnished reflected the error and that the Government should have discovered it. The Board made a finding to the contrary:

> Appellant has, however, argued that the error was discoverable by a comparison of parts numbers on the manufacturing cost sheets (Appt. Ex. A–26, A–27) and on the unpriced bill of materials in the proposal (Appt. Ex. A–36). At least on such inspection as we are able to make, this conclusion cannot be drawn from these documents with any degree of certainty.

This conclusion of the Board is binding upon the court since we find it to be a reasonable conclusion based upon the evidence, despite the fact that there may be other evidence which refutes it.

United States v. Carlo Bianchi & Co., 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L. Ed.2d 652 (1963).

The final item involves the duplication of the GPI Receivers. Plaintiff contends that this duplication was corrected during the negotiating sessions and represented one of the reductions in its proposal. This argument we find to be of little consequence. A unilateral rearrangement of figures during a 1964 negotiation, first revealed to the opposing government negotiators in a 1967 GAO Report, demonstrates a monumental failure of compliance with the Truth in Negotiations Act. Mere correction of figures without timely disclosure of such correction to the Government does not satisfy the requirements of the Act. Without disclosure the Government would be relying upon erroneous data during the negotiations while the contractor is relying upon the correct data. This type of unbalanced situation is the antithesis of the Truth in Negotiations Act and cannot be condoned.

The plaintiff also argues as to this duplication that the Government had information which would have revealed the error. The Board found otherwise and we again uphold its findings under the Wunderlich standards. The evidence shows that the plaintiff did give "some information" to an Air Force Administrative Contracting Officer (ACO) but that it was in relation to other contracts. This ACO who received "some information" did not participate in any active way in the negotiation and preparatory activities of the present contract. Thus the alleged disclosure certainly did not help the negotiators who were responsible for the instant agreement.

In general, as to all of the above items, plaintiff has argued that mere submission of data satisfied the requirement of disclosure. We do not agree. In order that there be effective disclo-sure of cost and pricing data by the prospective contractor the Government must be clearly advised of the relevant cost and pricing data. This is particularly true after the Government has analyzed the data and the contractor then receives reduced quotations from its suppliers.

■ If the Truth in Negotiations Act is to have any force and effect then the Government must be clearly and fully informed. This can only be achieved by complete disclosure of the item or items in question.

## II

### Significant Sums

Plaintiff's second major contention is that the Board erred in concluding the data in issue was "significant". Plaintiff's position is based on two interdependent arguments: first, that the "significance" of each item must be viewed individually; and, second, that in this case, a $21,000.00 item, viewed individually, is not a significant sum.

■ The element of "significance" relates to the *effect* of the disputed quotations on the final negotiated contract price. Cutler-Hammer, Inc., *supra* 189 Ct.Cl. at 91, 416 F.2d at 1315. If there is a logical nexus between the nondisclosed pricing data and the possibility of a lower negotiated contract price, then the data is to be considered significant and subject to disclosure.

■ Plaintiff's primary argument is that the data should be viewed on an individual rather than an aggregate basis. If this were to be adopted in every case, then the spirit of the Truth in Negotiations Act would easily be circumvented.[5] The potential effect upon the final negotiated price is of major concern. Whether the disputed data is considered individually or cumulatively is of little consequence if the end result in either instance is to cause an unwarranted increase in the contract price.

5. For example, a $5.00 item, viewed individually, may be of little import; however, if there were to be 10,000 of these items, then, when viewed in the aggregate, this same item could comprise an identifiable percentage of the contract price.

There is nothing in the legislative history to indicate that Congress intended the data to be solely considered individually. There is, however, an abundance of information indicating that Congress intended that the final contract price reflect current and accurate pricing data. This cannot be accomplished if consideration of disputed data is to be viewed strictly on an individual basis. Accordingly we find that there is substantial evidence to support the Board's finding that " . . . all of the items discovered by the GAO audit and included in the contracting officer's decision are significant in that, if disclosed, they would in all likelihood have led to a lower negotiation base and, hence, contract price." [6]

### III

#### *Reliance*

Plaintiff argues finally that the Board adopted a new and erroneous standard of burden of proof on the issue of reliance. Such is not the case. This burden was clearly discussed by the Board in a previous case, American Bosch Arma Corp., 65–2 BCA ¶ 5280. While that Board recognized that the responsibility of proving nondisclosure or use of inaccurate and noncurrent data falls upon the Government, it held that once this burden has been satisfied it would be the *natural and probable consequence* that such nondisclosure would result in an overstated negotiated contract price. This is a logical presumption, for it is reasonable to assume that the government negotiators relied upon the data supplied by the contractor and that this data affected the negotiations.

Thus although the Government has the *burden of proof* as to the issue of nondisclosed data, which it met in this case, the *burden of persuasion* on the issue of relying upon that data has shifted to the contractor. He must show nonreliance on behalf of the Government in order to rebut the natural and probable consequences of the existence of the nondisclosed or inaccurate data.[7] This the contractor has not done in this case. Accordingly the presumption stands and there was a causal relationship between the disputed data and the final negotiated price.

Having found that the Board was correct in concluding: (1) that the plaintiff-contractor failed to disclose accurate, complete and current cost and pricing data; (2) that the data not disclosed involved significant sums; and (3) that the Government relied upon the inaccurate data thus establishing a causal relationship between the incorrect data and the final negotiated contract price, we hold that the Board's decision withstands a Wunderlich Review. The Board's findings of fact are supported by substantial evidence and its legal conclusions are correct as a matter of law.

Accordingly, the plaintiff's motion for summary judgment is denied and the defendant's cross motion for summary judgment is granted. The petition is hereby dismissed.

6. Having concluded that in this case, the figures must be considered cumulatively, for to do otherwise would violate the spirit and intent of the Truth in Negotiations Act, we find it unnecessary to discuss plaintiff's argument that a $21,000 item, viewed individually, is insignificant.

7. This presumption has subsequently been codified by its adoption in the Armed Services Procurement Regulations in 1970:
   "In establishing that the defective data caused an increase in the contract price, the contracting officer is not expected to reconstruct the negotiation by speculating as to what would have been the mental attitudes of the negotiating parties if the correct data had been submitted at the time of agreement on price. In the absence of evidence to the contrary, the natural and probable consequence of defective data is an increase in the contract price in the amount of the defect plus related burden and profit or fee; therefore, unless there is a clear indication that the defective data was not used, or was not relied upon, the contract price should be reduced in that amount." 32 CFR § 3.807–5(a) (2).