**UNIVERSAL RESTORATION, INC.**

v.

**The UNITED STATES.**

No. 77–84C.

United States Claims Court.

July 19, 1985.

As Corrected Aug. 9, 1985.

Herman M. Braude, Washington, D.C., for plaintiff. Douglas L. Patin and Braude, Margulies, Sacks & Rephan, Chartered, of counsel.

Hillary A. Stern, with whom were Acting Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and Sandra P. Spooner, Washington, D.C., for defendant. Major Raymond C. McCann, Office of the Judge Advocate General, Dept. of the Army, Washington, D.C., of counsel.

## OPINION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

WHITE, Senior Judge.

In this case, the court is called upon to review, under the standards prescribed in the Wunderlich Act (41 U.S.C. §§ 321, 322 (1982)), certain actions taken by the Armed Services Board of Contract Appeals (the ASBCA). The case comes before the court on the plaintiff's motion, and the defendant's cross-motion, for summary judgment.

## The Facts [1]

The actions by the ASBCA under review involved a negotiated contract, No. DAHC30–74–C–0138 (the contract), which provided for the performance by the plaintiff of repair and restoration work on the ceiling and clerestory vaults of the National War College (the NWC), a National Historic Landmark located at Fort McNair, Washington, D.C.

The NWC's inner dome and clerestory vaults are constructed of Guastavino terracotta tiles. The tiles, arranged in the curving symmetry of the ceiling and walls of the building, are layered in depth and constitute the primary support for the central dome of the structure. They also serve a decorative purpose. In May 1974, some tiles, which formed part of the ceiling's decorative layer, fell to the floor of the rotunda, a distance of 65 feet. This created a safety hazard and brought into question the structural integrity of the dome.

The plaintiff, Universal Restoration, Inc., is a small business firm with a recognized expertise in the restoration and renovation of historic buildings. Having considered the plaintiff's competency in that field, engineering personnel of the Department of the Army requested the plaintiff to examine the dome of the NWC and submit a price proposal for all necessary emergency repair work.

On May 28, 1974, the plaintiff submitted a price proposal of $65,000 for the repair and restoration work on the NWC. In this connection, the plaintiff furnished information concerning the hourly rates of pay for its various categories of personnel that would be involved in the project, and inserted, at the end of the data, the following statement:

Overhead to cover our General and Administrative costs is 115%. Profit rate will be 10%.

Determinations were made by the Department of the Army that the plaintiff was the only source available to perform the necessary emergency repair work on the NWC, and that the plaintiff's price proposal was fair and reasonable when compared with similar contracts for time and materials and with the Government's own cost estimate for the NWC project.

The contracting officer did not make any attempt to negotiate with the plaintiff for a reduction in any part of its proposal.

The contract, a time and materials contract, was awarded to the plaintiff on May 31, 1974. It included (among other provisions) the standard "Disputes" clause.

By means of a contract modification dated August 26, 1974, the scope of the work to be performed under the contract was enlarged and the contract price was increased to $250,000. The price increase was based on the plaintiff's price quotation for the increased work, which was determined by the contracting officer to be fair and reasonable and which was accepted without any attempt to negotiate a lower price.

During the period beginning December 31, 1974, and extending through March 12, 1975, four additional contract modifications, further increasing the work requirements under the contract and also increasing the contract price, were agreed to by the parties. The final contract modification greatly expanded the work requirements and increased the final contract price to a figure substantially in excess of a million dollars.

The plaintiff satisfactorily completed the performance of the work under the contract on September 23, 1975.

During the contract period, the plaintiff's billings to the Government for work performed under the contract totaled $1,220,-644.87.

The Government paid the plaintiff a total of $1,021,204, and withheld the remainder of the amount requested, pending audit clearance of the plaintiff's billings.

1. The factual statements set out in this part of the opinion are based upon the ASBCA's findings of fact and upon a stipulation of facts agreed to by the parties.

Various audits were made by the Government. Errors in billings were discovered, and, on this basis, the ASBCA later determined that the correct total of all billings should have been $1,128,574. It appears that the plaintiff does not object to the ASBCA's finding on this point.

The Government's final audit was made on the theory that, as direct labor dollars greatly increased because of the various contract modifications, the overhead rate of 115 percent specified in the base contract should have been decreased correspondingly due to the broadening of the labor base. The audit concluded that, because of the plaintiff's excessive overhead rate in the charges for the work performed under the contract modifications, the plaintiff had overcharged the Government in the total amount of $130,561.

On the basis of the report of the final audit, the contracting officer determined that, because of the use by the plaintiff of the 115 percent overhead rate in its pricing data for all phases of the contract, the Government had actually overpaid the plaintiff to the extent of $23,173.

### Proceedings Before ASBCA

The plaintiff took an appeal to the ASBCA from the refusal of the contracting officer to pay the full amount of the contract price, as determined by the plaintiff. In the appellate proceeding, the defendant sought to recover an additional sum of $23,173 from the plaintiff as an amount allegedly overpaid the plaintiff because of the latter's use of the 115 percent overhead rate in pricing the contract modifications.

The plaintiff's appeal to the ASBCA was referred to Division No. 6 of the Board for consideration and decision. Division No. 6 at that time consisted of Administrative Judges John J. Norman, Paul E. Williams, Monroe E. Freeman, Jr., Harris J. Andrews, Jr., and William J. Ruberry.

Judge Norman conducted the hearing on the plaintiff's appeal to the ASBCA. The decision of the ASBCA on the appeal was rendered by Division No. 6 on April 9, 1982; and, by a vote of 3 (Judges Norman, Williams, and Andrews) to 2 (Judges Freeman and Ruberry), the appeal was sustained. The Board declared that "[t]he monies withheld should be released to the appellant [plaintiff here] forthwith with appropriate interest as authorized by the contract."

The Government subsequently filed a motion for reconsideration with the ASBCA. By that time, Judge Norman had retired from the ASBCA, and he had been replaced in Division No. 6 by Judge John M. Brady.

On February 2, 1983, by a vote of 3 (Judges Freeman, Ruberry, and Brady) to 2 (Judges Williams and Andrews), Division No. 6 reversed the previous decision of April 9, 1982, on reconsideration, and denied the plaintiff's appeal.

Thereafter, the plaintiff filed with the ASBCA a motion to vacate the decision of February 2, 1983. This motion was denied by Division No. 6 in a unanimous decision dated October 7, 1983. The membership of Division No. 6 had not undergone any change since the previous decision of February 2, 1983, was rendered.

The plaintiff filed its complaint with the court under the Wunderlich Act on February 17, 1984.

### Discussion

Change in Membership of Division No. 6

The plaintiff's first attack on the ASBCA's decision of February 2, 1983, is based upon the action of Administrative Judge John M. Brady—who had not been a member of Division No. 6 at the time when the initial decision on the plaintiff's appeal was issued and, accordingly, had not participated in the deliberations leading up to that decision—in taking part in the deliberations and casting the deciding vote when Division No. 6 acted on the Government's motion for reconsideration. The plaintiff asserts that "[i]t * * * [was] gross procedural error to permit a new division member to take part in the decision on reconsideration and operate as a 'swing vote' or a 'tie-breaker,'" and that this "converted the process of rational decision-making into a

gambling transaction dependent on the vagaries of personnel changes."

It should be noted, at the outset of the discussion on this particular point, that Judge Brady's action did not violate the ASBCA's prescribed procedure for the handling of motions for reconsideration. The ASBCA's Administrative Memorandum No. 41 (January 4, 1970) provided in pertinent part as follows at the time involved here:

Insofar as possible Motions for Reconsideration will be considered by the same Division which originally determined the appeal. All members of the Division, except those disqualified from participation, present at the time the decision on the Motion for Consideration is circulated for concurrence will participate in deciding the Motion, *whether or not a particular division member participated at the time of the original decision.* [Emphasis supplied.]

The plaintiff cites and relies on a number of state court decisions from different States holding that, in a multiple-member appellate court, a member who did not participate in a previous decision by the court cannot properly participate in any reconsideration by the court of the previous decision (*e.g., Flaska v. State*, 51 N.M. 13, 177 P.2d 174 (1947); *Cordner v. Cordner*, 91 Utah 474, 64 P.2d 828 (1937); *Gas Products Co. v. Rankin*, 63 Mont. 372, 207 P. 993 (1922); *People v. Evening News Ass'n*, 16 N.W. 691 (Mich.1883)).

The defendant, however, has referred to other state court decisions which found no error in situations where a member of an appellate court, who did not participate in a previous decision by the court, nevertheless took part in a subsequent reconsideration of the decision (*e.g., Lowe v. City of Eugene*, 254 Or. 518, 459 P.2d 222 (1969); *Battle v. Mason*, 293 P.2d 324 (Okla.1955); *Metropolitan Water District v. Adams*, 19 Cal.2d 463, 122 P.2d 257 (1942)). These courts apparently proceeded on the premise stated in the *Metropolitan Water District* case to the effect that parties "have no right, constitutional or otherwise, to a deci-

sion by any particular judge or group of judges" (122 P.2d at 263).

The ASBCA, in establishing its procedure on motions for reconsideration, obviously adhered to the view that a claimant seeking reconsideration of a previous decision does not have a right to a decision on reconsideration by any particular board member or group of board members, but only to a decision by the same Division, as then duly constituted.

This court does not regard the ASBCA's procedure in this respect as having deprived the plaintiff of due process, or as being otherwise impermissible. Rather, it was an acceptable way of coping with the practical problem of changing personnel among the various Divisions of the ASBCA. The power to reconsider their previous decisions was properly vested in the several Divisions as ongoing institutions, whose membership would inevitably change from time to time.

Our predecessor, the United States Court of Claims, took into account the practicalities facing administrative agencies in exercising their quasi-judicial functions. That court did not find error in a situation where the hearing officer who presided over the hearing on an appeal to the ASBCA did not subsequently participate in the ASBCA's consideration of, or decision on, the appeal (*Tri-Cor, Inc. v. United States*, 198 Ct.Cl. 187, 194–95, 458 F.2d 112, 116–17 (1972)), or in a situation where the member of the ASBCA who conducted the hearing on an appeal to that body did not write the ASBCA's decision on the appeal (*Sternberger v. United States*, 185 Ct.Cl. 528, 537, 401 F.2d 1012, 1017 (1968)).

■ Accordingly, we hold that Judge Brady's participation in the decision by Division No. 6 of the ASBCA on the defendant's motion for reconsideration did not invalidate the decision.

### The Overhead Rate

It has been mentioned that the original contract, which called for a total contract price of $65,000, was supplemented by a

statement from the plaintiff concerning the hourly rates of pay for its various categories of personnel that would be involved in the project, plus the assertion that "[o]verhead to cover our General and Administrative costs is 115%." It has also been mentioned previously that there were five subsequent contract modifications, which greatly increased the work requirements under the contract and ultimately increased the final contract price to a figure substantially in excess of a million dollars.

In connection with each of the contract modifications, the price for the additional work was based upon the price proposal submitted by the plaintiff and accepted by the Government without negotiation or objection. In each instance, the plaintiff computed its proposed price upon the pricing data set out in the plaintiff's letter of May 28, 1974, which included an item of 115 percent as representing the applicable overhead rate. No calculation was made by the plaintiff in connection with any contract modification to determine what its actual overhead costs and rate would be for the extra work, as the plaintiff believed that the overhead rate of 115 percent fixed for the base contract was applicable automatically to each contract modification.

The plaintiff's price proposal for each contract modification was determined by the contracting officer to be both fair and reasonable, based on cost estimates by the Government; and the plaintiff's price proposal was accepted without any attempt being made by the contracting officer to negotiate a reduction in the plaintiff's proposed price.

Responsible personnel of the Government was aware that, in pricing each modification to the contract, the plaintiff included the 115 percent overhead rate which was applicable to the base contract.

It has been noted previously that the contracting officer refused to pay over to the plaintiff money that had been withheld from the contract price. The contracting officer based such refusal on his ultimate determination that the overhead figure of 115 percent was excessive for the work

under the contract modifications, as the plaintiff's overhead costs and rate had decreased in relation to labor costs due to the great expansion of the work requirements under the contract modifications.

At the time when the contract and its several modifications were entered into, the so-called Truth-in-Negotiations Act (the Act), 10 U.S.C. § 2306(f) (1970)), provided in part as follows with respect to defense (and certain other) contracts:

(f) A prime contractor or any subcontractor shall be required to submit cost or pricing data under the circumstances listed below, and shall be required to certify that, to the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete and current—

(1) Prior to the award of any negotiated prime contract under this title where the price is expected to exceed $100,000;

(2) Prior to the pricing of any contract change or modification for which the price adjustment is expected to exceed $100,000 * * *; [and]

＊　　＊　　＊　　＊　　＊　　＊

Any prime contract or change or modification thereto under which such certificate is required shall contain a provision that the price to the Government, including profit or fee, shall be adjusted to exclude any significant sums by which it may be determined by the head of the agency that such price was increased because the contractor or any subcontractor required to furnish such a certificate, furnished cost or pricing data which * * was inaccurate, incomplete, or noncurrent * * *.

In the present case, it has been mentioned that the original contract price was for an amount less than $100,000. All but one of the contract modifications, however, increased the contract price by an amount greater than $100,000; and, upon the adoption of the first modification, the contract was amended so as to include a clause dealing with the subject of "Price Reduc-

tion for Defective Cost or Pricing Data." This clause provided in part as follows:

> (b) If any price, including profit or fee, negotiated in connection with any price adjustment under this contract was increased by any significant sums because:
>
> > (i) The Contractor furnished cost or pricing data which was not complete, accurate and current as certified in the Contractor's Certificate of Current Costs or Pricing Data;
> >
> > \*  \*  \*  \*  \*  \*
>
> the price shall be reduced accordingly and the contract shall be modified in writing as may be necessary to reflect such reduction.  \* \* \*

In its first decision on the plaintiff's appeal, the ASBCA held that although the Act was not applicable to the base contract because the original contract price was for an amount less than $100,000, the Act was applicable to each of the contract modifications; that during the performance of the work under the contract modifications, there was a fluctuating and declining overhead rate as the labor base expanded; that the plaintiff had an obligation to disclose its decreasing overhead rate to the Government; and that the plaintiff failed to discharge this duty of disclosure. Nevertheless, the ASBCA further held that the burden was on the Government to show the existence of a causal connection between the plaintiff's inaccurate overhead figure and an overstated price for the contract modifications; and that the Government had not satisfied this burden. Consequently, the ASBCA, in its first decision, sustained the plaintiff's appeal.

In the decision on reconsideration, however, the ASBCA said that there is a legal presumption that the nondisclosure of accurate pricing data affects a contract price; that this presumption was sufficient to establish for the Government a *prima facie* showing that the plaintiff's non-disclosure of accurate data concerning its overhead rate resulted in overstated prices for the contract modifications; that the burden was on the plaintiff to rebut the presumption; and that the plaintiff failed to do so.

Accordingly, the ASBCA on reconsideration reversed its initial decision and denied the plaintiff's appeal.

The plaintiff argues before the court that the ASBCA erred as a matter of law when it held in both decisions that the plaintiff was under an obligation to disclose to the Government information concerning the plaintiff's then-current overhead rate, in relation to labor costs, as the work requirements under the contract expanded and the contract price increased under the several contract modifications.

One argument made by the plaintiff in support of this position is that the Act was not applicable to the contract modifications because there were no price negotiations in connection with any of the modifications, and there was no submission by the plaintiff of any cost or pricing data to the Government before the various contract modifications were agreed to by the parties. In other words, it seems to be the plaintiff's view that the Act applies only in a situation where a government contractor submits to the Government cost or pricing data which are inaccurate, incomplete, or noncurrent. This overlooks the mandatory language of the Act, which states that a Government contractor *"shall be required* to submit cost or pricing data \* \* \* [p]rior to the pricing of any change or modification for which the price adjustment is expected to exceed $100,000" (emphasis supplied), and that the contractor must certify that the submitted data are accurate, complete, and current. *Cf. Sylvania Electric Products, Inc. v. United States,* 202 Ct.Cl. 16, 26, 479 F.2d 1342, 1348 (1973); *Lockheed Aircraft Corp. v. United States,* 193 Ct.Cl. 86, 94, 432 F.2d 801, 805 (1971). As the Court of Claims said in *Sylvania Electric Products,* "[i]f the Truth in Negotiations Act is to have any force and effect then the Government must be clearly and fully informed" (202 Ct.Cl. at 26, 479 F.2d at 1348).

■ The plaintiff also says that both parties "construed the previously accepted contract rates as being fixed throughout

the life of the contract." Even if the evidence in the administrative record clearly established—which it does not—that the representatives of the plaintiff and of the Government proceeded on the assumption that the pricing data for the base contract were fixed for the contract modifications as well, government personnel lacked the authority to waive, either expressly or by implication, the provision of the contract—inserted at the time of the first modification pursuant to the mandatory requirement of the Act—which declared that the contract price must be adjusted to exclude any significant sums by which the price was increased because the contract furnished pricing data which were inaccurate, incomplete, or noncurrent. As the Court of Claims said in *M–R–S Manufacturing Co. v. United States*, 203 Ct.Cl. 551, 561–62, 492 F.2d 835, 841 (1974), the duty to furnish accurate, complete, and current data is imposed on government contractors by a statute, and this duty cannot be waived by a government agent.

■ Furthermore, the circumstance that the contract modifications involved in this case were part of a fixed-price contract did not excuse the plaintiff from complying with the requirement of the Act that the plaintiff furnish to the Government accurate, complete, and current cost and pricing data in connection with the several contract modifications. *Lockheed Aircraft Corp. v. United States*, 193 Ct.Cl. 86, 97, 432 F.2d 801, 806–07 (1971).

The court agrees with the position taken by the ASBCA, both in its initial decision and in the subsequent decision on reconsideration, that the Act placed upon the plaintiff the mandatory duty to furnish to the Government accurate, complete, and current data as to the plaintiff's overhead rate in connection with each of the contract modifications.

The plaintiff has a fall-back position to the effect that the ASBCA, in its initial decision and also in the decision on reconsideration, made a factual error when it determined that the plaintiff's overhead rate, in relation to labor costs, decreased as the work requirements expanded and the contract price increased pursuant to the several contract modifications. The ASBCA's factual determination that the plaintiff's actual overhead rate declined from the original figure of 115 percent as the work requirements expanded and labor costs greatly increased as the result of the contract modifications was based upon a government audit report dated March 4, 1981 (the 1981 audit). The plaintiff argues that the ASBCA improperly ignored an earlier audit report dated March 28, 1979 (the 1979 audit), which concluded that the plaintiff's overhead rate during the performance of the work under the contract modifications approximated the 115 percent rate specified in the plaintiff's cost and pricing data submitted in connection with the price proposal on the base contract.

With respect to this aspect of the case, it must be kept in mind that the scope of judicial review in a case of this type under the Wunderlich Act is limited. Factual findings by the ASBCA must be accepted by the court as final and conclusive unless, after a review of the entire record, it is determined that the factual findings are either unsupported by substantial evidence or that they are fraudulent, capricious, arbitrary, or so grossly erroneous as necessarily to imply bad faith (41 U.S.C. § 321 (1982)). Consequently, it is not the prerogative of the court to determine whether the 1979 audit or the 1981 audit was the more accurate. Rather, the court's function is limited to a determination of whether the 1981 audit, on which the ASBCA relied, constituted substantial evidence of a decrease in the plaintiff's overhead rate during the performance of the work under the contract modifications. (There is no indication whatever in the record that this determination by the ASBCA was fraudulent, capricious, arbitrary, or so grossly erroneous as necessarily to imply bad faith.)

Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S.

197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Schnip Building Co. v. United States,* 227 Ct.Cl. 148, 160, 645 F.2d 950, 957–58 (1981). It is clear that the 1981 audit did constitute substantial evidence of a decline in the plaintiff's overhead rate as labor costs greatly increased under the contract modifications.

It appears that the 1979 audit—which the plaintiff says the ASBCA should have accepted—utilized financial data in the plaintiff's annual financial statement for 1974 in concluding that the overhead rate of 115 percent fixed for the base contract also approximated the plaintiff's actual overhead rate in performing the work under the contract modifications. On the other hand, the 1981 audit utilized monthly financial statements of the plaintiff for months which preceded the beginning of the work under the several contract modifications in determining that there was a substantial decrease in the plaintiff's actual overhead rate as the work progressed under the contract modifications. Using this approach, the 1981 audit determined that the plaintiff's overhead rate for the work under the several contract modifications ranged from a high of 89.2 percent to a low of 72.7 percent.

As indicated earlier in the opinion, it is neither the prerogative nor the responsibility of the court to determine whether the 1979 audit or the 1981 audit used the more appropriate approach in determining what the plaintiff's actual overhead rate was in performing the work under the contract modifications.

■ It is sufficient for the court to determine, as it does, that it was reasonable for the 1981 audit, and for the ASBCA, to rely on the plaintiff's monthly financial statements which preceded the several contract modifications in computing what the projected overhead rate for the modifications should have been, instead of relying—as did the 1979 audit—on the plaintiff's annual financial statement for 1974. The data in the monthly financial statements were more current, in relation to the modifications, than were the data in the finan-

cial report for 1974. It was apparent from these monthly statements that there was a cumulative, declining trend in the plaintiff's actual overhead rate.

Thus, the administrative record provides substantial evidentiary support for the ASBCA's determination concerning the decline in the plaintiff's actual overhead rate as the labor costs increased due to the expansion of the work requirements under the contract modifications.

There remains for consideration the question of whether there is substantial evidence in the record supporting the ASBCA's determination on reconsideration that there was a causal connection between the plaintiff's failure to disclose to the Government that its overhead rate was declining as the work under the contract modifications progressed and an overstated contract price.

■ There is a presumption that the "natural and probable consequence" of a failure by a government contractor to disclose accurate, complete, and current cost and pricing data in negotiating a contract price is an overstated price. *Sylvania Electric Products, Inc. v. United States, supra,* 202 Ct.Cl. at 27, 479 F.2d at 1349. This presumption arises because "it is reasonable to assume that the government negotiators relied upon the data supplied by the contractor and that the data affected the negotiations" (*id.,* 202 Ct.Cl. at 27–28, 479 F.2d at 1349).

■ Thus, the presumption of an overstated price for the work under the contract modifications arose from the proof that the plaintiff, in submitting its price proposals on the contract modifications, did not disclose to the Government accurate, complete, and current data concerning its overhead rate at the time, but, instead, based its proposed prices on the overhead rate of 115 percent fixed for the base contract in the plaintiff's letter of May 28, 1974. The plaintiff had the burden of rebutting this presumption by showing that government personnel, in accepting the plaintiff's price proposals on the contract

modifications, did not, in fact, rely on the cost and pricing data set out in the plaintiff's letter of May 28, 1974. *Sylvania Electric Products, Inc. v. United States, supra,* 202 Ct.Cl. at 28, 479 F.2d at 1349.

■ The plaintiff did not meet this burden. The administrative record is devoid of evidence showing positively, or from which it could reasonably be inferred, that government personnel did not rely on the cost and pricing data set out in the plaintiff's letter of May 28, 1974, when such personnel accepted the plaintiff's price proposals for the contract modifications. Testimony by a contracting officer that she did not remember reflecting on the plaintiff's overhead rate in connection with the contract modifications fell far short of the convincing evidence needed by the plaintiff to show that government personnel did not rely on the cost and pricing data set out in the plaintiff's letter of May 28, 1974, in accepting the plaintiff's price proposals for the contract modifications. Accordingly, the presumption of overstated prices on the contract modifications, arising from the plaintiff's failure to disclose cost and pricing data that were then accurate, complete, and current, was not rebutted and remains fully effective for the present case.

■ Actually, from the facts—as found by the ASBCA and not questioned by the plaintiff—that government personnel was aware that, in pricing each modification, the plaintiff included the 115 percent overhead rate applicable to the base contract, and that government personnel, with such knowledge, paid the plaintiff's billings for the work performed under the contract modifications (subject to an audit of the mathematical accuracy of such billings), it can reasonably be inferred that government personnel at all times was relying on the cost and pricing data set out in the plaintiff's letter of May 28, 1974, as being accurate, complete, and current as to the various contract modifications.

It appears, therefore, that there is substantial evidence supporting the determination by the ASBCA, on reconsideration, that the plaintiff's failure to disclose accurate, complete, and current cost and pricing data in connection with the price proposals for the work under the contract modifications resulted in overstated prices for the extra work, and, accordingly, that the plaintiff was not entitled to recover on its claim.

### The Overpayment Matter

It was mentioned earlier in the opinion that the defendant, in the proceedings before the ASBCA, sought reimbursement from the plaintiff in the amount of $23,173, allegedly representing the amount by which the Government overpaid the plaintiff because of the overstated prices for the extra work done under the contract modifications.

The ASBCA did not, either in its initial decision or in the decision on reconsideration, discuss or act on the Government's claim for the recovery of an alleged overpayment in the amount of $23,173.

In the answer to the complaint which the defendant filed in this court, no counterclaim against the plaintiff was asserted. Although the brief in support of the defendant's cross-motion for summary judgment asks that the court enter a judgment "in favor of defendant in the amount of $130,561," this request is ineffective insofar as the assertion of a counterclaim is concerned. RUSCC 13(a) states in mandatory language that "[t]he *answer* shall state as a counterclaim any claim which, at the time of serving the answer, the defendant has against any plaintiff, if it arises out of the transaction or occurrence that is the subject of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction" (emphasis supplied).

Accordingly, there is no proper basis upon which this court can act on the request in the defendant's brief for a judgment against the plaintiff.

### Conclusion

For the reasons previously stated in the opinion, the court concludes that the deci-

sion of the ASBCA on reconsideration was correct as a matter of law, that it was based upon factual findings which were supported by substantial evidence, and that it was not fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith. Accordingly, the decision of the ASBCA on reconsideration is affirmed.

The plaintiff's motion for summary judgment is denied and the defendant's cross-motion for summary judgment is granted.

The clerk will therefore dismiss the complaint.

IT IS SO ORDERED.