NIES, Circuit Judge.
Universal Restoration Inc. appeals the decision of the United States Claims Court[1] holding that Universal had violated the Truth in Negotiations Act and that Universal’s recovery under the contract was precluded by the contract’s defective pricing clause. The dispute centers on the amount charged by the contractor for overhead which was found to be excessive. We reverse.
I.
The subject contract required the repair and restoration of the ceiling and the clerestory vaults of the National War College, a National Historic Landmark located at Fort McNair, Washington, D.C. The structure’s inner dome and clerestory vaults are constructed of “Gustavino” ter-ra-cotta tiles specially layered in depth so as to constitute primary support for the central dome of the structure. In May, 1974, some of the tiles which formed the ceiling area, some sixty-five feet above the floor of the rotunda, loosened and fell to the floor causing a safety hazard and raising doubts as to the structural integrity of the dome itself.
The government requested Universal, a small firm with highly regarded expertise in the field of restoration and renovation of historic buildings, including experience with terra-cotta tiles, to submit a price proposal on a time-and-material basis for emergency repair work to the dome. Universal, on May 28, 1974, submitted a price proposal of $65,000, which specified an overhead rate of 115% and a profit rate of ten percent of direct labor costs. These rates were Universal’s standard add-ons and, as a matter of company policy, Universal would accept nothing less than its established mark-ups on any contract.
The government determined that Universal was the only source available to perform the emergency work and that Universal’s price proposal was fair and reasonable when compared with similar type contracts for time and materials and the government’s own cost estimate. The contracting officer made no attempt to negotiate with Universal for a reduction in any part of its proposal. The government awarded the contract to Universal on May 31, 1974.
*1402 In August, 1974, the government began to enlarge the scope of work to be performed as a result of engineering studies (not made by Universal) with respect to what was required and as additional funds became available. The contract price rose incrementally over a nine month period to $1,349,800.[2] With respect to each modification, the rates proposed in Universal’s original May, 1974, proposal remained in effect. Each time, the government accepted Universal’s price proposal without attempting to negotiate for a reduction in any part of its proposal. The contracting officer and the Board of Awards did, however, determine that Universal’s proposal in each instance was both fair and reasonable based on government estimates and the previous work performed on the project. Universal satisfactorily completed the contract on September 23, 1975.
During the contract period, Universal billed the government for work performed in the amount of $1,220,644.87, the billings being calculated on the basis of the 115% markup for overhead. Universal made no calculations of its actual overhead rate in connection with these billings. The government paid Universal $1,021,204 and withheld the balance, pending audit clearance of Universal’s complete billings. This withholding was the subject of several audits and a long running dispute between the parties.
The contract became the subject of intense auditing once it became an after-the-fact cause celebre because of its growth in price from a modest $65,000 to in excess of $1,000,000. Between August, 1975, and March, 1981, the government audited Universal’s performance six times. Two of these audits were routine voucher audits. Four audits were performed with respect to Universal’s cost and pricing data and overhead expense with the 115% overhead rate being the focus of the audits. Two of these audits were made the subject of Universal’s board appeal. The first audit indicated that Universal’s overhead rate remained at about 115% throughout the contract period. However, the second audit report, based on a one month period, concluded that Universal’s overhead rate had declined and that, if Universal had furnished current overhead data at the time of each contract modification, the contracting officer would have negotiated a lower overhead rate. The second audit recommended a reduction of $130,561 in the contract price. After the parties failed to resolve the dispute through negotiations, the contracting officer issued a final decision in favor of the government. Universal timely appealed to the Armed Services Board of Contract Appeals.
II.
A. The Statute
The Truth in Negotiations Act, Pub.L. 87-653, § 1(e), 76 Stat. 528-29 (1962), codified as amended at 10 U.S.C. § 2306(f), requires that (1) certain government contractors and would-be contractors must certify, to the best of their knowledge and belief, that the “cost or pricing data [they] submitted [to the government] was accurate, complete and current,” and (2) any contract under which such a certificate is required shall contain a provision that “the price to the Government, including profit or fee, shall be adjusted to exclude any significant sums by which it may be determined by the head of the agency that such price was increased because the contractor ... furnished cost or pricing data which was inaccurate, incomplete or noncurrent.”[3] *1403 To implement the Truth in Negotiations Act, the government mandated the inclusion in every contract subject to the Act of a uniform clause entitled “Price Reduction for Defective Cost or Pricing Data.”[4] 32 C.F.R. §§ 3-807-5, 7-104.29(b) (1970). At the time of the instant contract, the statutory obligation applied to contracts or contract modifications in excess of $100,000 only.[5] Although the original contract in this case did not meet the statutory threshold, the subsequent contract modifications invoked the “defective pricing clause.”
B. The Decisions Below
In its original decision of April 9, 1982, Universal Restoration, Inc., 82-1 BCA ¶ 15,762 at 77,998 (ASBCA 1982), the ASBCA found that Universal had “failed to discharge [its] disclosure duty since its stated overhead was not always its actual overhead which fluctuated monthly.” However, the ASBCA recognized that mere nondisclosure does not invoke the defective pricing clause. Rather, a presumption that the contract price would have been lower arises when the government carries its burden of proving nondisclosure. Id. at 77,-999. Once the government proves nondisclosure, the burden of going forward shifts to the contractor to prove nonreliance by the government on the nondisclosure. Id.; Sylvania Electric Products, Inc. v. United States, 202 Ct.Cl. 16, 479 F.2d 1342, 1349 (1973). In this case ASBCA originally found no reliance by the government on the nondisclosure of Universal’s actual overhead rate. The majority noted that Universal was the only source available to perform the original emergency repair work; that it would have been impracticable to allow another contractor to perform any of the contract work; that Universal’s prices were found by the government to be fair and reasonable; that Universal would accept nothing less than its established overhead markup; and that the government made no attempt to negotiate with Universal for a reduction in any part of its proposals. 82-1 BCA at 77,995-997. From these findings, the majority (Norman, Williams, and Andrews, JJ.) concluded “that the contracting officers involved did not rely on [Universal’s] pricing data and, thus, were not misled by [Universal’s] failure to disclose its actual overhead rate.” Id. at 77,-998.
From these findings, the board majority concluded:
The ultimate burden of showing the causal connection between the inaccurate data and an overstated contract price, however, remains with the Government. *1404 In our opinion the Government has not satisfied this burden.
We are unable to conclude from the record before us that even if the fact of the appellant’s declining overhead had been brought to the contracting officer’s attention it would have had any practical effect on the price of any one of the contract modifications. The record establishes that the appellant would accept nothing less than its stated overhead rate leaving the Government to take it or leave it. There is no question in our mind but that the Government would have taken it in view of its obvious and proven reluctance to question any of the appellant’s several price proposals.
In our opinion, these circumstances are sufficient to rebut the presumption of the natural and probable consequence of the nondisclosure. Inasmuch as no evidence was presented to overcome this rebuttal, we are unable to find that the Government satisfied its ultimate burden of establishing that the contract price was overstated because of the appellant’s failure to reveal its actual as opposed to its policy overhead. Hence, there is no basis for reducing the contract price because of the variance between the appellant’s actual as opposed to its established policy overhead.
Id. at 77,999-78,000.
Two judges, Freeman and Ruberry, dissented on the ground that the contracting officer’s
failure to attempt negotiating lower prices does not indicate an indifference to actual costs but rather the absence of any cost data on which to base a demand for lower prices. Moreover, their findings that the prices were fair and reasonable is no evidence that they would not have attempted to negotiate lower fair and reasonable prices had appellant disclosed accurate, complete and current cost data.
Id. at 78,000.
The government sought reconsideration of the original decision. Between the original decision and the reconsideration, the author of the original decision, Judge Norman, retired. The two dissenting judges from the original decision, Freeman and Ruberry, along with Judge Norman’s replacement, Judge Brady, formed the majority in the reconsideration decision of February 2, 1983. Universal Restoration, Inc., 83-1 BCA U 16,265 (ASBCA 1983). On reconsideration, the majority modified two findings and reversed the ultimate conclusion of the original decision:
On reconsideration, we find the last sentence of finding 23[6] misleading without a further finding that: “Neither did they testify that they would have accepted appellant’s proposed prices even if the current overhead rate had been disclosed.” We reject the argument that lack of testimony by the contracting officers as to what they would have done had proper disclosure been made requires the conclusion that the agreed price was unaffected by the nondisclosure. There is a legal presumption that the non-disclosure did affect the price____ Government counsel was not required to elicit testimony to the same effect to establish the Government’s pri-ma facie case. It was incumbent on appellant to rebut the presumption____ If the contracting officers had testified that they would have agreed to the same price even if the current overhead rate had been disclosed, then the presumption would have been rebutted. But appellant’s counsel did not elicit such testimony from them.
We also find error in our finding 24.[7] The absence of price discussions does not *1405 support a finding of nonreliance by the contracting officer on the disclosed costs. Since those costs supported the proposed prices, the contracting officers had no reason to discuss or negotiate those prices. Neither do the contracting officers’ determinations that the prices were fair and reasonable support the conclusion that they would have agreed to those prices regardless of appellant’s actual costs. Moreover, there is no exception in the Truth in Negotiations Act for fair and reasonable prices.
Id. at 80,826 (citations omitted). The remaining members of the original majority, Judges Williams and Andrews, dissented from the reconsideration.
Universal moved to vacate the reconsideration decision on the ground that the ASBCA’s procedure of allowing a change in personnel to change the results of a decision was arbitrary and capricious. On October 3, 1983, all five members denied Universal’s motion to vacate. Universal Restoration, Inc., 84-1 BCA ¶ 16,918 (ASBCA 1983). Universal then appealed to the United States Claims Court pursuant to the Wunderlich Act, 41 U.S.C. §§ 321-322 (1982).
On appeal, Universal challenged the reconsideration decision both on procedural and substantive grounds. The Claims Court (White, S.J.) affirmed. Universal Restoration, Inc. v. United States, 8 Cl.Ct. 510 (1985). With respect to Universal’s objection to reconsideration having been given by a different group of board members, the Claims Court noted that the ASBCA’s procedure was in accordance with its prescribed internal operating procedures and found support for the practice in decisions of state courts and the United States Court of Claims. The court concluded that the board’s procedure did not deprive Universal of due process and was not otherwise impermissible. Id. at 514.
On the substantive issues, the court held that Universal had a duty to disclose its actual overhead rate and found that the second audit constituted substantial evidence in support of the board’s finding that Universal’s overhead rate decreased. The court further upheld the ASBCA’s decision that Universal had not met its burden of rebutting the presumption of reliance. Accordingly, the Claims Court affirmed the decision of the ASBCA. Universal timely appealed the decision of the ASBCA to this court.
III.
Universal urges a host of grounds for reversal, both procedural and substantive. However, we need consider only the portion of the ASBCA decision holding that the contract price was overstated because of Universal’s failure to disclose its fluctuating overhead rates.[8]
In its first decision, the ASBCA explicitly found that the overhead rate was a standard company add-on; that Universal would accept nothing less than its established markups on any of its contracts; *1406 that Universal was “the only source available to perform the necessary emergency repair work”; and “that it would be impracticable to allow another contractor to perform any of the contract work.” 82-1 BCA at 77,995, 77,997. These explicit findings were never set aside and are wholly inconsistent with the board’s conclusion on reconsideration that Universal failed to overcome the presumption that nondisclosure resulted in an overstated contract price. Accord Luzon Stevedoring Corp., 71-1 BCA 118745 (ASBCA 1971) (contractor’s proof of a take it or leave it offer rebuts presumption of natural and probable consequences); American Machine & Foundry Co., 74-1 BCA If 10,409 (ASBCA 1973) (contractor’s superior bargaining position resulting in part from status as sole source supplier rebuts presumption).
Accepting as correct that Universal’s overhead rate was in fact lower than 115%, we agree that Universal’s nondisclosure of that fact would give rise to a presumption that the non-disclosure affected the government’s agreement to the price. We further agree that no testimony from the government contracting officers to the effect that they would not have agreed to the price but for the nondisclosure is necessary to establish the government’s prima facie case. By the same token, it cannot be required that the contractor obtain an admission from the contracting officers that they would have agreed to the price had they known the true rate of current overhead. The issue would not be before the board if the contracting officers were of that mind. One cannot expect that by skillful cross-examination Universal’s counsel would have obtained statements from the government’s witness that would explicitly negate the government’s claim. Had counsel asked the suggested questions, the answer one would expect is, “Yes, it would have made a difference.” That is basic to the government’s claim in seeking a reduction in the price. Counsel cannot be faulted for not asking a question to which the answer is self-evident and would buttress the government’s case. Moreover, the board’s view that Universal was required to elicit testimony from the government admitting nonreliance effectively makes the presumption irrebuttable. An irrebuttable presumption of fact violates due process. Vlandis v. Kline, 412 U.S. 441, 453, 93 S.Ct. 2230, 2237, 37 L.Ed.2d 63 (1973).
The key finding here was that Universal would not accept less than 115% markup for overhead. If Universal would accept no less, as the board found, there would have been no contract, not a contract at a lower price. The conclusion is inescapable that nondisclosure of actual overhead—a cost Universal did not ever actually calculate in its regular business—did not affect the agreed-upon contract price.
Because the government relied solely on the presumption that nondisclosure resulted in an overstated contract price, our holding that Universal rebutted the presumption ends our inquiry. In the terms of our standard of review, the board’s decision is unsupported by substantial evidence.[9]
*1407 IV.
We reverse the decision of the Claims Court.
REVERSED.

. Universal Restoration, Inc. v. United States, 8 Cl.Ct. 510 (1985).

. The additional work fell within certain exceptions to the competitive bid requirements.

. Prior to the 1980 amendments, 10 U.S.C. § 2306(f) read, in pertinent part:
(f) A prime contractor or any subcontractor shall be required to submit cost or pricing data under the circumstances listed below, and shall be required to certify that, to the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete and current—
(1) Prior to the award of any negotiated prime contract under this title where the price is expected to exceed $100,000;
(2) Prior to the pricing of any contract change or modification for which the price adjustment is expected to exceed $100,000, or *1403 such lesser amount as may be prescribed by the head of the agency;
******
Any prime contract or change or modification thereto under which such certificate is required shall contain a provision that the price to the Government, including profitor fee, shall be adjusted to exclude any significant sums by which it may be determined by the head of the agency that such price was increased because the contractor or any subcontractor required to furnish such a certificate, furnished cost or pricing data which, as of a date agreed upon between the parties (which date shall be as close to the date of agreement on the negotiated price as is practicable), was inaccurate, incomplete, or noncur-rent; Provided, That the requirements of this subsection need not be applied to contracts or subcontracts where the price negotiated is based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities to the general public, prices set by law or regulation or, in exceptional cases where the head of the agency determines that the requirements of this subsection may be waived and states in writing his reasons for such determination.

. The defective pricing clause included in the modified contract reads, in pertinent part:
(b) If any price, including profit or fee, negotiated in connection with any price adjustment under this contract was increased by any significant sums because:
(i) The Contractor furnished cost or pricing data which was not complete, accurate and current as certified in the Contractor’s Certificate of Current Costs or Pricing Data; ******
the price shall be reduced accordingly and the contract shall be modified in writing as may be necessary to reflect such reduction.

. Congress enacted § 2306(f) with a $100,000 threshold. Congress raised the threshold to $500,000 in 1981, Pub.L. 97-86, Title IX, § 907(b), 95 Stat. 117, 118 (1981), but restored it to $100,000 in 1984, Pub.L. 98-369, Title XII, § 2724, 98 Stat. 1192 (1984).

. Finding 23 of the original opinion stated:
Each of the three contracting officers assigned to this contract appeared as Government witnesses at the hearing of this appeal. None of them testified that if they had known of the appellant’s actual overhead they would have refused to accept the appellant’s various price proposals.

. Finding 24 of the original opinion stated:
Inasmuch as the record presented establishes that each contract pricing action was determined to be fair and reasonable independent *1405 of any negotiation or discussion with the appellant, we find that the contracting officers involved did not rely on the appellant’s pricing data and thus were not misled by the appellant’s failure to disclose its actual overhead rate.

. The Wunderlich Act, 41 U.S.C. §§ 321-322 (1982), provides the following standard of review:
§ 321. Limitation on pleading contract provisions relating to finality; standards of review No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: Provided, however, That any such decision shall be final and conclusive unless the same is fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported hy substantial evidence.

§ 322. Contract provisions making decisions final on questions of law

No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.

. In view of our decision that the reconsideration decision cannot stand, the issue of the propriety of the rehearing is not controlling here. We do, however, have serious questions about the board’s procedure. The authority relied on and which the court uncovered recognizing that a decision on rehearing may be made by a different judge or judges deals with a single judge court or an in banc court or a panel being reviewed in banc. None deals with simply changing the composition of a panel.
Where the original panel reconsiders and changes a decision, a member of the original majority must vote for the change. In the Supreme Court where less than a majority may order rehearing, a member of the original majority must vote for the rehearing. These procedures are readily acceptable as "fair." Sup.Ct.R. 51.1 (1980); Ambler v. Whipple, 90 U.S. (23 Wall.) 278, 281-82, 23 L.Ed. 127 (1874).
In this case, the procedure is troubling, particularly if Division V has more than five members {i.e., five cannot be treated as the equivalent of in banc for the Division). If the original author of the majority could not be recalled to participate in the reconsideration, then the vote of the four remaining members, being split, would mean that the decision stands on reconsideration. What appears to be the case here is that there was in fact no reconsideration. A different panel simply disagreed with the first decision. Why the first decision warranted reconsideration at all is a mystery.