UNITED STATES of America, ex rel;
TAXPAYERS AGAINST FRAUD;
Christopher Urda, Plaintiffs–Appellees,

v.

The SINGER COMPANY,
Defendant–Appellant,

Link Flight Simulation Corporation;
CAE–Link Corporation,
Defendants–Appellees.

UNITED STATES of America, ex rel;
TAXPAYERS AGAINST FRAUD;
Christopher Urda, Plaintiffs–Appellees,

v.

The SINGER COMPANY,
Defendant–Appellant,

Link Flight Simulation Corporation;
CAE–Link Corporation, Mesa Holdings
Limited Partnership, Defendants–Ap-
pellees.

UNITED STATES of America, ex rel;
TAXPAYERS AGAINST FRAUD;
Christopher Urda, Plaintiffs–Appellees,

v.

MESA HOLDINGS LIMITED PART-
NERSHIP, Defendant–Appellant,

Link Flight Simulation Corporation;
CAE–Link Corporation, the Singer
Company, Defendants–Appellees.

Nos. 89–2396, 89–2417 and 89–2418.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 12, 1989.

Decided Nov. 22, 1989.

Morton M. Maneker (Charles S. Sims, Thomas C. Moore, Proskauer Rose Goetz & Mendelsohn, New York City, on brief), Keith P. Ellison (Baker & Botts, Houston, Tex., William Alden McDaniel, Jr., Murphy & McDaniel, Baltimore, Md., on brief), for defendant-appellant.

Steven D. Aitken (Stuart E. Schiffer, Acting Asst. Atty. Gen., Breckinridge L. Willcox, U.S. Atty., Joyce R. Branda, Michael B. Suessmann, Attys., Civ. Div., Dept. of Justice, Robert E. Montgomery, Jr., Leslie G. Fagen, Derick P. Berlage, Erika A. Kelton, John R. Phillips, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D.C., John E. Hoffman, Jr., Carole L. Fern, Lorraine K. Rak, John P. Biederman, Shearman & Sterling, New York City, Stephen J. Immelt, Piper and Marbury, Baltimore, Md., on brief) for plaintiffs-appellees.

Before MURNAGHAN, SPROUSE and CHAPMAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

The Singer Company has been the subject of a recent highly leveraged buy out. There has also been initiated a *qui tam* complaint against Singer. The United States, claiming $77,000,000 under the False Claims Act, 31 U.S.C. § 3729, which may be trebled (*i.e.*, $231,000,000) and also may be increased upon further investigation of the facts by the government, sought and obtained a preliminary injunction from the United States District Court for the District of Maryland, Judge Herbert F. Murray presiding, on May 25, 1989.[1]

The preliminary injunction required Singer to obtain court review and approval of non-ordinary-course-of-business transactions to prevent Singer, without court awareness, from further liquidating or distributing its assets.

The appeal was expedited by order of June 14, 1989.[2] In addition, both Singer and Mesa Holdings Limited Partnership ("Mesa")[3] appeal from an order issued on June 30, 1989, which denied Singer's motion, filed May 30, 1989, in the district court asking it to review and approve three transactions. Singer sought approval (1) of a payment of $81 million, plus accrued interest, to Mesa and Shearson Lehman Brothers Holdings, Inc. ("Shearson");[4] (2) of a payment of quarterly dividends when they were due to ripen on its $3.50 cumulative preferred stock; and (3) of a sale of its SimuFlite division to any person unrelated to Singer on such terms as the Singer Board of Directors should determine to be reasonable.

On June 28, 1989, the court held a hearing on Singer's motion seeking such approval, at which time Mesa's motion to intervene was granted. On June 30, 1989, the court denied Singer's motion for approval and, on July 11, 1989, set forth its reasons. Singer and Mesa filed notices of

---

1. On May 2, 1989, Judge Frederic N. Smalkin had entered a temporary restraining order which Judge Murray refused to vacate on May 24, 1989. The scenario which led to the request for the injunction was the rapid divestiture of Singer divisions, together with representations by Singer that it had no future plans to reduce further its net worth, coupled with the government's discovery that those representations were apparently subject to scrutiny, *i.e.*, Singer had, after the date involved, activated the repurchase of certain stock.

2. We denied by the same order Singer's motion to stay the preliminary injunction pending appeal.

3. On June 27, 1989, Mesa moved to intervene and joined in Singer's motion for approval of certain transactions.

4. The $81 million represents: $1 million on senior subordinated "notes" issued to Shearson; $9.6 million for the repurchase of Class C Singer common stock held by Shearson; $49 million on junior subordinated "notes" issued to Mesa; $1 million for the repurchase of junior preferred Singer stock held by Mesa; and $20.4 million for the repurchase of the Class B Singer common stock held by Mesa. To a substantial extent, the securities (debt and stock) emanated from the buy-out.

appeal on June 30, 1989 and July 5, 1989, respectively, and the appeals were consolidated with the appeal of the preliminary injunction.[5]

The preliminary injunction was granted in connection with an ongoing lawsuit of the United States against Singer, Link Flight Simulation Corp. ("Link Flight"),[6] and CAE–Link Corp. ("CAE–Link"). In its first amended complaint filed on March 14, 1989, following the unsealing of the *qui tam* complaint brought by two relators, the United States alleged that Link Flight had engaged in a long-term scheme between 1980 and 1988 to defraud the government in the negotiation of sole-source, fixed price contracts with the Department of Defense.[7] Link Flight failed to disclose certain contingency costs designed to offset price reductions expected to occur during negotiations with the government, in violation of its obligation to bid its "best estimate" of the costs to perform the contract.[8] *See* 48 C.F.R. § 15.804–6 (1988). Two former Link Flight employees stated that the purpose of the hidden reserves—referred to internally as the "negotiation loss" or "management reserve"—was to offset the anticipated price reductions that would occur during negotiations with the government's contracting officials.

The government seeks, *inter alia*, treble damages pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, totaling at least $231 million. The damages are based on documents obtained from Link Flight which show a total of $77 million in undisclosed negotiation loss reserves.[9]

The government moved for a preliminary injunction when it became concerned that Singer, which had been successfully targeted for a leveraged buyout,[10] was quickly liquidating its divisions to pay off the acquisition debt incurred in connection with the takeover. Before the takeover in early 1988, Singer had assets of approximately $1.58 billion and shareholders' equity of $633 million (as of December 31, 1987). About a year later, following the takeover and divestiture of a majority (9) of its divisions (including Link Flight), Singer's assets had decreased to $445 million and its shareholders' equity had fallen to $80 million.

The government requested the preliminary injunction because more divestiture

---

5. On July 14, 1989, Shearson moved to intervene in the district court, and also moved for reconsideration of the court's June 30, 1989 order. The motion for reconsideration has since been withdrawn by Shearson.

6. Link Flight was originally an unincorporated division of Singer which was incorporated in April 1988. In August 1988 Singer sold it to CAE Industries which merged it in December 1988 into one of its subsidiaries, CAE–Link Corporation.

7. The contracts involved flight simulators produced by Link Flight for the government to use in training pilots.

8. Sole-source contracts, by their nature, are not subject to the competitive bidding process, that is, the situation in the case of a sole-source contract is not one where the lowest bid gets the contract. Therefore, sole-source contracts would be open to abuse if the regulations did not impose an obligation that the bids reflect the company's true cost estimates.

9. The amount of $77,000,000 is based on seven contracts as to which the government believes Link Flight had concealed reserves. Whether review of other contracts will lead to upward

revision of the government's claim remains to be seen.

10. The takeover was financed through a combination of methods. The goal was to make a public tender offer to acquire approximately $1.1 billion worth of Singer's outstanding stock. A consortium of banks, led by the Bank of Nova Scotia ("BNS"), provided $540 million. Paul Bilzerian, the raider and brain behind the takeover, assembled a limited partnership to provide $100 million. Shearson, an investment banking firm, provided $355 million, which was unsecured, and for which it would receive 10% of the takeover profits (Class C common stock), plus interest on the loan at 5% over prime, and various fees. Another $150 million was obtained, unsecured, from Mesa, in exchange for 20% of the takeover profits (Class B common stock), earned interest of approximately 18%, and various fees. Mesa, which owned approximately 10% of Singer's common stock prior to the takeover, agreed also to subordinate its interest to Shearson and had the right to take control of Singer's board of directors if Singer failed to make payments. Any party to the transaction had the option to call for the repurchase of Mesa's Class B and Shearson's Class C common stock, *i.e.*, a distribution of takeover profits.

was planned and not all of the acquisition debt had been repaid.[11]

In September of 1988, Bilzerian, on behalf of Singer, called for the repurchase of the Class B and Class C common stock. Disagreement arose as to the valuation of the takeover profits. As settlement, Mesa agreed to take $20.4 million and Shearson $9.6 million.[12] The agreement also permitted Mesa to take control of Singer's board of directors if the redemption of Mesa's stock did not occur before July 1, 1989.[13]

## DISCUSSION

### 1. The District Court Had the Power to Issue the Preliminary Injunction

The district court's memorandum dated May 24, 1989, which was adopted on the following day as the court's reasoning for its grant of the preliminary injunction, carefully addressed the issue of its power to issue the preliminary injunction. In sum, it concluded that the Supreme Court case relied on by Singer, *De Beers Mines v. United States*, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945), was distinguishable and that the situation presented here was more closely aligned with those described in *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), and *United States v. First National City Bank*, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965).[14]

■ Judge Murray's application of the general principles as explained in his memorandum is far from flawed. Preliminary injunctions are permitted in situations such as the one presented here where the plaintiff alleged that the principal defendant was "insolvent and threatened with many law suits, that its business [was] virtually at a standstill because of unfavorable publicity, that preferences to creditors [were] probable, and that its assets [were] in danger of dissipation and depletion." *Deckert*, 311 U.S. at 285, 61 S.Ct. at 232.[15]

■ Moreover, Singer's assertion that the district court erred in finding a realistic threat of insolvency fails in view of the clearly erroneous standard of review and the evidence substantially supporting those findings. The district court did not err in considering the *ad damnum* demands in other suits in assessing the threat of insolvency. *See Deckert*, 311 U.S. at 285, 61 S.Ct. at 231; *cf. Tri–Continental Leasing*

11. The bank consortium debt was paid in full. Singer has repaid Shearson $354 million of its $355 million investment, and has repaid Mesa $100 million of its $150 million investment.

12. Therefore, Singer owed a total of $81 million to Mesa and Shearson, $70.4 million and $10.6 million, respectively.

13. There were some other contingencies to the repayment of the $81 million, *e.g.*, BNS approval which hinged upon the termination of letters of credit for Singer's SimuFlite Division.

14. The case of *In re Fredeman Litigation*, 843 F.2d 821 (5th Cir.1988), in which the Fifth Circuit vacated an injunction, is likewise distinguishable. There the court specifically noted that the injunction before it was not granted for the purpose of "preserv[ing] specific assets when the defendant was about to become insolvent[,]" as would have been permissible under *Deckert*. *Id.* at 828.

15. The briefs, for the most part, do not add anything to the basic reasoning of the district court. The one possible exception is the line of cases which hold that "[a] court has the power to issue a preliminary injunction to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989); *Federal Saving & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 560 (5th Cir.1987) (district court's inherent equitable powers permit preliminary injunction to secure equitable remedy such as restitution). The government does seek the equitable remedy of restitution in its unjust enrichment and payment under mistake of fact claims. However, these claims only involve single damages, as Mesa points out. In any event, Judge Murray's authority sufficed and searching for additional support is not productive.

On the other side of the coin, Singer's suggestion that the government had to use bankruptcy or attachment proceedings under state law to justify the grant of the preliminary injunction construes too narrowly the Supreme Court's approval of the exercise of general equitable power to protect a plaintiff's right to recovery found in *Deckert* and *First National City*. *See, e.g., Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52 (1st Cir.1986); *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386 (7th Cir.1984); *Mutual Benefit Life Ins. Co. v. Atlas Financial Corp.*, 454 F.2d 278, 279 (3rd Cir.1972).

*Corp., Inc. v. Zimmerman,* 485 F.Supp. 495, 499–500 (N.D.Cal.1980) (under California Uniform Fraudulent Conveyance Act, pending lawsuits are existing debts for the purpose of determining solvency). Consequently, it was appropriate to consider that Singer had potential liability of $235 million, excluding punitives, as defendant of several pending lawsuits.

Singer has also criticized the district court's finding that Singer "is for all practical purposes in the process of an orderly liquidation." Singer contends that the newspaper article cited for the district court's conclusion is insufficient and that the record evidence is to the contrary. It is true that some liquidation typically follows many hostile takeovers and that Singer may have announced the completion of its divestiture program on October 3, 1988. Singer, however, ignores other evidence in the record which supports the district court's conclusion that Singer had not completed its distribution of assets.

First, Singer had represented that an injunction would not be necessary because it did not intend to reduce further its capital and then, four days later, Singer re-purchased $30 million worth of stock from its shareholders. It has also attempted to sell its SimuFlite Division and on July 10, 1989, with court approval, did sell a Canadian subsidiary, Singer Company of Canada, Ltd. Given that Singer's assets dropped from $1.58 billion to less than $450 million after the takeover and its equity similarly fell from $445 million to $80 million, that its current liabilities ($270.6 million) for the quarter ending March 31, 1989 exceed its current assets ($235.3 million) and that Singer's net income for the same period was only $1.1 million, it was not unreasonable for the district court to conclude that "[i]n these unique circumstances, it is probable that in the absence of an injunction

Singer would have no assets left to satisfy a judgment in this case, irreparably injuring the government."

## 2. The District Court Did not Abuse its Discretion in Granting the Preliminary Injunction

■ The test to determine whether a preliminary injunction should be granted was set out in *Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co., Inc.,* 550 F.2d 189 (4th Cir.1977). Under the test, the district court must assess (1) the likelihood that the party seeking the injunction will succeed on the merits of its case, (2) the relative harms to the parties, and (3) the public interest in granting or denying the injunction. *Id.* at 195–96. If the balance of the harms tips decidedly in favor of the party requesting the injunction, then that party need only raise a serious question on the underlying merits. *Id.*

The standard of review on appeal is whether the district court abused its discretion in granting the preliminary injunction. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Merrill Lynch, Pierce, Fenner & Smith v. Bradley,* 756 F.2d 1048, 1055 (4th Cir.1985).[16]

Singer contends that the district court erred in assessing the probability of harm to the government and the extent of the harm to Singer. It apparently concedes the seriousness of the government's complaint against it,[17] but contends that the damages are greatly inflated, factually and legally.

### a. Harm to the Government

Singer attempts to undermine the court's irreparable harm finding by arguing that the government can collect any judgment

---

**16.** What the government points out in citing *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380 (7th Cir.1984), may be particularly true here. There the Seventh Circuit explained that the deferential standard was important because of "the imponderable character of the balancing process and the [district] judge's superior feel for the issues which a cold transcript may not fully communicate to the reviewing

court." *Id.* at 390. *See also Ritter v. Ulman,* 78 F. 222, 224 (4th Cir.1897).

**17.** The district court found that the complaint alleged and the evidence revealed a classic fraudulent pricing scheme. *See United States v. Foster Wheeler Corp.,* 316 F.Supp. 963 (S.D.N.Y. 1970), *modified,* 447 F.2d 100 (2d Cir.1971).

against Singer from the solvent co-defendant, CAE–Link. Singer maintains that CAE–Link is liable because Link Flight (when initially incorporated in preparation for sale) had assumed all of the liabilities associated with the unincorporated Link Flight division of Singer under a Novation Agreement. Singer claims that any judgment is secured by the fair market value of Link Flight which was determined to be $560 million as of last year when Singer sold its stock in Link Flight to CAE.[18]

The district court determined that Singer was still a guarantor under the Novation Agreement observing that CAE–Link contested its liability for Link Flight's fraudulent activity.

Singer's claim that "CAE–Link's attempt to 'contest' liability is patently insubstantial" is itself specious. Rather, as CAE–Link explained, it assumed liability for *performance* of the contract, but not for any statutory liability under the False Claims Act. The intentional and secretive nature of the fraudulent activity is unrelated to the *performance* of the contract, *i.e.*, it is related solely to the attainment of the contracts. *See* 48 C.F.R. § 42.1201 (1988) (regulations defining novation). Therefore, the district court did not err in finding that CAE–Link had contested its liability and that the position, which well may necessitate resolution on the merits, is not insubstantial as Singer would have it characterized.

Moreover, not only does the Novation Agreement clearly determine that Singer guaranteed those contractual liabilities, it also expressly reserved any and all rights

the government had against Singer. The point is that the government went after Singer and Singer cannot attempt to show lack of irreparable harm by pointing to a tangential defendant who may have assets to cover a judgment on a different theory of liability.[19] Singer, in effect, is telling the government to file a different suit against CAE–Link and not to bother Singer, because "Singer has made such adequate arrangements for the protection of its creditors that recourse to Singer's assets is unlikely to be necessary." Although a creative argument, we believe that the proper focus is on Singer, the primarily liable defendant, and what Singer can pay. *See Foltz v. U.S. News & World Report*, 760 F.2d 1300, 1308 n. 8 (D.C.Cir. 1985).

Singer next contends that the government is harmed at most by $4.5 million for which it has adequate assets and equity to pay. Singer asserts that the district court erred by relying on the government's *ad damnum*, which claims $231 million ($77 million, trebled) in damages. Singer disputes the single damages amount of $77 million and asserts that, at most, the damages can be doubled, not trebled. Both of these contentions lack merit.[20]

The district court stated that the evidence showed that Link Flight padded its best estimate figures by 4% to 17% (usually in the 7% to 10% range) and that the government alleged that at least $77 million could be shown to have been fraudulently included as "management reserves" in the bid figures submitted to the government on the seven contracts.[21] There-

**18.** Singer contends that "[i]n essence, by the Novation Agreement with the United States, Singer has posted a bond or purchased an insurance policy, naming the United States as the beneficiary, for half a billion dollars to secure a potential judgment in its favor."

In actuality, there is no bond filed with the court, or insurance policy naming the United States as beneficiary. There is also no fund placed into escrow which could satisfy a judgment in favor of the government. It is quite questionable whether the Novation Agreement supplies the breadth of protection which Singer attributes to it.

**19.** CAE–Link has also disputed the fact that it has sufficient assets to satisfy a judgment.

**20.** Singer also claims error because the district court failed to make specific findings under Rule 52(b) with respect to the disputed issue of damages. The case it cites, *First–Citizens Bank & Trust Co. v. Camp*, 432 F.2d 481, 484 (4th Cir.1970), found error because the district court made *no* assessment at all and plaintiff had not alleged any specific damages, but only claimed irreparable injury.

**21.** The government also alleged that the $77 million figure might increase upon further investigation.

fore, it concluded that the total potential liability under the False Claims Act was at least $231 million.

Singer's position is that the government was actually injured at most by $1.45 million because the total cost, after negotiations, of the seven contracts which concededly had the undisclosed "negotiation loss reserves" was $19,130,000 less than the total dollar amount of the honest "best estimate" figures. Singer argues that the undisclosed funds dissolved as part of the negotiated price reductions, except for $1.45 million on the Chinook Simulator, and, therefore, the undisclosed funds never damaged the government except by the $1.45 million which did not disappear after negotiations.

The law provides for a rebuttable presumption that the government is damaged dollar-for-dollar by the nondisclosed amount once nondisclosure is shown. *See Sylvania Elec. Prod., Inc. v. United States,* 479 F.2d 1342, 1349 n. 7 (Ct.Cl.1973) (in Truth in Negotiations Act context, in absence of contrary evidence, natural and probable consequence of defective data is increase in contract price in amount of defect plus related burden and profit or fee); *see also Universal Restoration, Inc. v. United States,* 798 F.2d 1400, 1406 (Fed. Cir.1986) (in Truth in Negotiations Act context, nondisclosure leads to presumption of overstated contract price). The obvious premise upon which the presumption operates is that fraudulent inflation of cost proposals fundamentally distorts the negotiation process for a sole-source contract and that the eventual contract price likely would have been *even lower* than the company's "best estimate" had the contractor instead provided the government with that uninflated estimate at the start of negotiations. Singer claims that its evidence, summarized above, rebuts the presumption.

As the government has persuasively argued, to permit Singer to rebut the presumption on the basis that the reserves disappeared after negotiations defies logic. Whatever costs or prices were reduced had nothing to do with negotiating away of a reserve which was unknown. The government contracting officer stated that he typically achieved significant price reductions when negotiating.[22] Because the government is presumed to have made out a *prima facie* case that it would have spent dollar-for-dollar less than the undisclosed, fraudulent amount, the offender must meet the burden of showing "nonreliance on behalf of the Government in order to rebut the natural and probable consequences of the existence of the nondisclosed or inaccurate data." *Sylvania,* 479 F.2d at 1349. In other words, the offender must show that it would not have accepted further reductions, *i.e.,* the government would still have spent that amount or the offender would not have contracted at all, to rebut entirely the presumption. *Cf. Universal,* 798 F.2d at 1406 (the key finding of rebuttal was the fact that Universal's history of negotiating showed that it would not accept less than 115% markup for overhead and therefore no contract would have been signed).[23]

Finally, Singer disputes trebling of the damages and contends that only doubling of the damages is permitted because Congress intended that the trebling amendment to the False Claims Act was to comport with a similar statute, the Defense Authorization Act ("DAA"), Pub.L. No. 99–145, 99 Stat. 583 (1985), which specifically provided that treble damages would be available only for claims made after its effective date, November 8, 1985. Singer points out that all but one of the contracts were entered into prior to that effective date.

---

**22.** This is further supported by Singer's own argument that the total contract price was $19 million less than what the best estimate amount would have been without the hidden "reserves." The fact that even more money was saved ($19 million over the reserve amount) indicates that Link Flight was willing to reduce even *real* costs during negotiations.

**23.** Similarly, the fact that Singer's ultimate profits were reasonable (16%) does not mean that it would not have selfishly accepted more if the government contracting officer had not been so aggressive or that it might have accepted less if the negotiations had started from an honest "best estimate" rather than the inflated one submitted.

Singer argues that the plain language of the DAA precludes treble damages, but the plain language may be restricted to *claims* made prior to November 8, 1985 and not *contracts* entered into before the effective date. *See id.* § 931(c). The question would thus seem premature in deciding whether the preliminary injunction should be upheld or vacated. Moreover, the government cites cases which hold against Singer's position. *See United States v. Board of Education of Union City*, 697 F.Supp. 167, 170–72 (D.N.J.1988); *United States v. Oakwood Downriver Medical Center*, 687 F.Supp. 302, 304–08 (E.D.Mich. 1988); *United States v. Ettrick Wood Products, Inc.*, 683 F.Supp. 1262, 1264–68 (W.D.Wisc.1988); *United States v. Hill*, 676 F.Supp. 1158, 1165–72 (N.D.Fla.1987); *but see United States v. Bekhrad*, 672 F.Supp. 1529, 1530 (S.D.Iowa 1987). Finally, there is no merit to Singer's attempt to distinguish the cases by arguing that they failed to consider that Congress intended for the DAA to apply non-retroactively and that the FCA could not have implicitly repealed the DAA. Singer's point overlooks the plain language that the DAA does operate retroactively to some degree because contracts entered into before the effective date may be the factual basis for a claim brought after the effective date.

#### b.  *Harm to Singer*

Although Singer attempts to paint a very bleak picture showing that the injunction has forced Singer into the receivership of the district court, the injunction specifically excludes actions taken by Singer in the ordinary course of its business. Singer has not lost total control and only extraordinary actions must first be noticed and approved by the district court. The district court has approved some requests, *e.g.*, the sale of the Canadian subdivision, and has disapproved of others, *e.g.*, distribution of takeover profits and interest thereon to

Mesa and Shearson.  (That disapproval, which only delays, but by no means necessarily frustrates, ultimate payment, *inter alia*, forms the basis of one of the consolidated appeals.)

The only harm related to the preliminary injunction which Singer identifies is the delay factor in seeking court approval and the weaker bargaining position Singer has while negotiating with other parties. Those speculative concerns are not adequately demonstrated. Singer has not shown that it has lost a deal because of delay or that it could have obtained a better deal if the injunction had not been imposed.[24]

Consequently, the district court did not err in concluding that on balance the harm to the government decidedly outweighed the harm to Singer.[25] The preliminary injunction is upheld as the district court did not abuse its discretion.

3.  *The District Court did not Abuse its Discretion in Denying Singer's Motion for Approval of Payments to Mesa and Shearson and for Sale of SimuFlite*

■ Singer and Mesa have also appealed from the district court's order of June 30, 1989, by which the court denied Singer's request for authorization (1) to make $81 million in payments to Mesa and Shearson, (2) to pay the quarterly per share dividend on its $3.50 cumulative preferred stock, and (3) to sell the SimuFlite Division.

#### a.  *Payment of $81 million to Mesa and Shearson*

The harm to the government is that the distribution of $81 million would result in a reduction of Singer's assets by approximately one-fifth and reduce its net worth to $50 million, greatly increasing the risk to the government that it will never be able to

---

**24.**  Similar burdens of delay and pre-approval by outside entities may also be present because of the terms of the takeover deal or because of federal law.

**25.**  The final part of the *Blackwelder* test, *i.e.*, the public interest, clearly supports an injunction.

The district court found that the "public is clearly served by addressing fraud in government contracting and preserving the government's ability to recoup monies fraudulently paid." That finding appears to be undisputed.

recover monies fraudulently obtained. The public interest to deter such fraudulent exploitation of the public fisc may well not be served otherwise than by the preliminary injunction.

Singer contends that it is harmed because (1) Mesa and Shearson will sue it for non-payment, (2) Mesa will have the right to take control of the board, and (3) Singer's standing in the financial community (and value to its stock) will be damaged. However, none of those concerns result in substantial harm to Singer which outweighs the harm to the government in the absence of the injunction.

It must not be forgotten that a preliminary injunction has a very self-limiting effect, remaining in force only for the time necessary for resolution on the merits. It is perhaps often over simple to describe a preliminary injunction as preserving the *status quo* if altogether precise *status quo* is what is had in mind. Things can only rarely be rendered purely static. As Heraclitus long ago observed: "Nothing is but is becoming."

The objective of a preliminary injunction is to minimize those changes which will most profoundly affect one of the parties in an adverse manner if they occur before the merits of the question or questions in issue are decided.

In that connection, regular course of business transactions are not affected by the preliminary injunction and extraordinary ones may proceed with court approval.

Second, Singer is not liable on the contracts with Mesa and Shearson because of, and during the life of, the injunction prohibiting their performance. *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766–

67, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983).[26]

Third, Mesa's right to take control of the board, which has not been exercised, does not constitute irreparable harm. *See American Hospital Association v. Hansbarger*, 594 F.Supp. 483, 488 (N.D.W.Va. 1984) (permitting representatives of the community to serve on hospital boards is not irreparable harm where no showing has been made that such individuals are less capable of managing the affairs of the hospital). There has been no showing of insufficient capability here.

Fourth, although Singer's stock has decreased by approximately 30 percent since the TRO was first entered, Singer has not demonstrated how the injunction has caused that decrease.[27] *Post hoc propter hoc* has little support as a logical device. The adverse publicity of the underlying lawsuit itself certainly has contributed to the stock devaluation. It is impossible to determine with confidence what additional effect the preliminary injunction has had or how the hostile takeover and dismantling of Singer to pay off acquisition debt has influenced the market's assessment of Singer stock.

The district court's finding that the harm to the government clearly outweighed the harm to Singer is not clearly erroneous.[28] Therefore, the district court did not abuse its discretion in prohibiting the payments to Mesa and Shearson. The extensive listing of dire, yet speculative, possibilities may not interrupt the district court in making findings of fact, and that is especially true when a preliminary injunction—by nature temporary in nature—is under consideration.

---

**26.** The Bank of Nova Scotia also had to approve the payments to Mesa and Shearson. There is no showing that it has or will approve the payments or that the letters of credit, upon which approval is contingent, have been terminated. *See supra* note 13.

**27.** The harm to Mesa and Shearson is minimal, *i.e.*, the payments are only postponed. The district court determined that such are the risks of big-time investment in takeover exploits. Finally, it is a question deserving of decision on the

merits whether the $81 million is equity rather than debt, subordinating Mesa and Shearson's claims to claims of other creditors, including the United States, if Singer could not meet all of its obligations.

**28.** Mesa's argument that the court errs in applying equity to situations involving takeovers does not account for the fairly recent development of leveraged buyouts and the necessity of dealing with a new situation. As situations evolve the law too always "is becoming."

b. *The Dividends of the Preferred Shareholders*

The harm to the government was not clearly specified yet is evident. The harm to the shareholders would be minimal because the dividends are cumulative and the shareholders will receive their dividends when the injunction is lifted (assuming that Singer has any assets left).

c. *The Sale of Singer's SimuFlite Division*

The district court found that Singer's request for approval was premature because it did not have any specific terms of sale ready for review and approval. It was not an abuse of discretion to deny Singer *carte blanche* approval since that would have been inconsistent with the purpose underlying the preliminary injunction.

The judgment is, accordingly,

AFFIRMED.