# United States Court of Appeals
## For the First Circuit

No. 03-2408

CHARLESBANK EQUITY FUND II, LIMITED PARTNERSHIP AND
HARVARD PRIVATE CAPITAL HOLDINGS, INC.,

Plaintiffs, Appellants,

v.

BLINDS TO GO, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Selya and Howard, Circuit Judges,
and Singal,* District Judge.

John T. Montgomery, with whom Martin J. Newhouse, Lesley F.
Wolf, and Ropes & Gray LLP were on brief, for appellants.
David H. Erichsen, with whom Peter A. Spaeth, Debra Squires-
Lee, Michael R. Dube, and Hale and Dorr LLP were on brief, for
appellee.

June 2, 2004

_____
*Of the District of Maine, sitting by designation.

**SELYA**, **Circuit Judge**. This appeal challenges the district court's denial of a preliminary injunction seeking what amounts to a freeze order (although its proponents describe the requested relief as being in the nature of an equitable attachment). Concluding, as we do, that the lower court correctly chose to employ the traditional four-part standard for gauging the propriety of preliminary injunctive relief in this situation and proceeded to apply that standard faultlessly, we affirm the decision below.

## I. BACKGROUND

Our starting point is the cast of characters. Defendant-appellee Blinds To Go, Inc. (BTG) operates a slew of retail stores in North America (a few of which are located in Massachusetts). Plaintiffs-appellants Charlesbank Equity Fund II, Limited Partnership (Charlesbank) and Harvard Private Capital Holdings, Inc. (HPCH) are affiliated entities that make and hold investments on behalf of the President and Fellows of Harvard College.

The litigation between these protagonists has its roots in a venture capital transaction. On December 18, 1995, HPCH and BTG entered into a preferred share purchase agreement (the Agreement). Pursuant to the Agreement, HPCH made a $15,000,000 capital investment and, in exchange, BTG issued to HPCH the entirety of a new class of stock, totaling 20,618,556 preferred shares with conversion privileges. As a prophylactic device, BTG

-2-

insisted that HPCH grant to the holders of BTG's common stock a right of first refusal. The provision embodying this safeguard, as amended and restated in a 1997 shareholders' agreement, required that the holders of BTG's common stock be afforded the opportunity of first refusal in the event of any transfer of the preferred shares arising out of a third party's "bona-fide offer to purchase" the shares (so long as the offeror was "acting at arm's length").

The Agreement contained several other provisions. Of particular pertinence here, HPCH or its permitted assignee had the right to "put" all the preferred shares in specific time frames or upon the occurrence of certain triggering events. Receipt of notice of the exercise of this option obligated BTG to redeem the shares within sixty days at a per share price calculated in accordance with a formula delineated in BTG's corporate charter. A significant element of this formula was the EBITDA (i.e., earnings before interest, income tax, depreciation and amortization as determined in accordance with generally accepted accounting principles, consistently applied) for the immediately preceding twelve months. In order to secure the due performance of this buy-back obligation, BTG granted to HPCH a security interest in its existing and after-acquired assets.

The relationship between HPCH and BTG proved uneventful through the end of the millennium. A precursor to discord surfaced in November of 2001, when HPCH transferred its preferred shares and

appurtenant rights and interests under the Agreement (including its security interest in BTG's assets) to Charlesbank. Although the 1997 shareholders' agreement was still in effect, HPCH consummated the transfer without first offering the preferred shares to the holders of BTG's common stock. Charlesbank proceeded to exercise the "put" option in the first available window of opportunity, notifying BTG on January 14, 2002, of its desire that the company redeem the preferred shares. Under the terms of the Agreement, the EBITDA for the fiscal year ending on February 2, 2002 would apply to that redemption.

The calculation of the EBITDA did not go smoothly. Over the next few months, the figure diminished to a point well below what Charlesbank had anticipated. This shrinkage in turn lowered the projected purchase price of the preferred shares. As these estimates slumped, Charlesbank grew increasingly suspicious that BTG was cooking the books. The buy-back transaction stalled.

On June 21, 2002, Charlesbank took matters into its own hands. Invoking federal diversity jurisdiction, see 28 U.S.C. § 1332(a), it sued BTG in the United States District Court for the District of Massachusetts (BTG is a Canadian corporation that maintains its principal place of business there and Charlesbank is a Massachusetts limited partnership). The complaint asserted claims for breach of contract and breach of the implied covenant of good faith and fair dealing. HPCH (a Massachusetts charitable

-4-

corporation headquartered in that state) soon joined the fray as an additional plaintiff. The interests of the two plaintiffs are congruent and, from this point forward, we refer to them, collectively, as "C-H."

In October of 2002, BTG and the holders of its common stock countersued in a Canadian court. They sought a declaration that BTG did not owe any money to C-H because the transfer of the preferred shares was unauthorized. BTG posited that the transaction between Charlesbank and HPCH triggered the right of first refusal; that HPCH nonetheless disregarded that obligation; and that, therefore, the shunned right of the holders of BTG's common stock to purchase the preferred shares vitiated the purported transfer and trumped Charlesbank's right to exercise the "put" option. In the alternative, BTG asked for a judicial determination that it owed only $15,453,548 for the preferred shares.

The Canadian court of first instance dismissed the suit on the ground of forum non conveniens. That holding was affirmed on appeal (i.e., the Canadian appellate tribunal agreed that Massachusetts was a more convenient forum) but the dismissal was vacated and the case stayed pending resolution of the first-filed action. Thus, the battle between the parties shifted back to the federal district court.

C-H's primary allegation was — and is — that BTG manipulated its finances and shrank the EBITDA by posting a series of spurious year-end reserves after the "put" option had been exercised. In C-H's view, these machinations artificially deflated the EBITDA by nearly $5,000,000 (i.e., from $12,900,000 to just over $8,000,000) and the projected purchase price for the preferred shares by roughly $8,300,000 (every reduction of $1,000,000 in the EBITDA translates, under the formula, into a reduction of approximately $1,700,000 in the aggregate purchase price). BTG denied C-H's allegations; reiterated its claim that the right of first refusal should have been honored; and urged that, in all events, its books fairly and accurately reflected the company's finances.

Fed. R. Civ. P. 65(a) deals with the issuance of preliminary injunctions. On July 15, 2003, C-H invoked that rule and moved for a preliminary injunction "in the nature of an equitable attachment of the assets of the defendant." In practical effect, it sought to freeze a substantial amount of BTG's funds in order to secure eventual payment of the purchase price for the preferred shares. BTG opposed the motion, and the district court summarily denied it. The court's decision rested on two independently sufficient grounds. First, the court concluded that it lacked the authority to issue such an injunction under the Supreme Court's landmark opinion in Grupo Mexicano de Desarrollo,

-6-

S.A. v. <u>Alliance Bond Fund, Inc.</u>, 527 U.S. 308 (1999). Second, the court found that C-H had failed to show irreparable harm (and, thus, had not satisfied a necessary threshold requirement for the issuance of a preliminary injunction). After moving unsuccessfully for reconsideration, C-H appealed. We now affirm.

## II. APPELLATE JURISDICTION

Although the parties seem to be content that we have jurisdiction over this appeal, we are duty-bound to test that hypothesis. When a colorable question exists, an appellate court has an unflagging obligation to inquire sua sponte into its own jurisdiction. <u>See</u> <u>Espinal-Dominguez</u> v. <u>Commonwealth of P.R.</u>, 352 F.3d 490, 495 (1st Cir. 2003). That is the situation here.

As a general rule, only final orders are immediately appealable. <u>See</u> <u>id.</u> (citing 28 U.S.C. § 1291). Virtually every general rule admits of exceptions, however, and a statutory exception to this finality principle authorizes interlocutory review of orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1). Consequently, if the remedy that C-H seeks is in the nature of an injunction, we have jurisdiction here and now to review an order denying that relief.

This question comes to the forefront because C-H appears at times to argue that it is not seeking an injunction at all, but, rather, an equitable attachment. <u>See</u>, <u>e.g.</u>, Appellants' Br. at 1,

4.  For jurisdictional purposes, it matters whether the relief requested is more appropriately classified as an injunction or an attachment.  While orders granting or denying injunctions are immediately appealable, the status of attachment orders is more problematic.

It is common ground that — at least in the absence of special circumstances — federal appellate courts lack jurisdiction to undertake interlocutory review of orders granting prejudgment attachments.  See Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 45-47 (1st Cir. 1986); see also 16 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3922 (2d ed. 1995).  By like token, orders denying prejudgment attachments are not per se appealable when issued.  See 11 Wright & Miller, supra § 2936, at 24-25.  But such orders may be immediately appealable if they satisfy the requirements of the so-called collateral order doctrine.[1]  Id.

The taxonomic problem is complicated here because C-H's original request for interim relief is not a model of clarity.

---

[1]The collateral order doctrine is a judge-made exception to the finality principle.  See Espinal-Dominguez, 352 F.3d at 495. To satisfy this doctrine — and thus furnish a valid basis for an interlocutory appeal — the order appealed from must satisfy four basic criteria.  Id. at 496.  First, it must involve an issue unrelated to the merits of the main dispute, which is capable of review without disrupting the main litigation.  Second, the appeal must be capable of finally resolving the issue.  Third, the order must implicate a right incapable of vindication upon review after final judgment.  And finally, the order must embody an important and unsettled question of controlling law.  Id.

While that request at times employs the vocabulary of injunctive relief, it at times suggests that what C-H actually wants is an attachment (albeit an attachment derived from the district court's authority under Rule 65). Given this internal inconsistency, we must cut through the tangle of words and determine whether, functionally, C-H is seeking an injunction or an attachment. Morales Feliciano v. Rullan, 303 F.3d 1, 7 (1st Cir. 2002) (explaining that a court must look "to the practical effect of the order rather than its verbiage" to determine if it is appealable under 28 U.S.C. § 1292(a)(1)); accord Cobell v. Norton, 334 F.3d 1128, 1137 (D.C. Cir. 2003).

This court has noted several factors that should be considered in deciding whether a requested order is more akin to an injunction or an attachment. These factors include "the present and future consequences of the constraint involved; whether the order directs or restrains conduct of one of the parties; [and] how the order was treated below by the district court and the parties." Teradyne, 797 F.2d at 47.

Viewed through this prism, the order appealed from appears to be injunctive in nature. Because virtually all of BTG's assets are located outside of Massachusetts, the order, if granted, will operate by restraining BTG's conduct (i.e., commanding it to take certain actions and prohibiting it from taking others). This is the classic modus operandi of injunctive relief. See 11A Wright

& Miller, supra § 2941, at 32-33 (defining injunctions as orders that "require a party either to do or to refrain from doing some act").

This perception is reinforced by the fact that the parties and the district court treated C-H's motion as a motion for a preliminary injunction. Although a reviewing court must look beyond the nomenclature that parties or trial judges employ and gauge the practical effect of a requested order, Morales Feliciano, 303 F.3d at 7, earlier characterizations of the underlying motion are relevant to that determination, see Teradyne, 797 F.2d at 46, 47. Here, this factor tilts in favor of appellate jurisdiction.

The motion for reconsideration that C-H filed in the district court dispels any lingering doubts. The motion papers make pellucid that C-H wanted the court preliminarily to enjoin BTG, its agents, officers, employees and all persons acting in concert with it, "from spending, dissipating, transferring, selling, or otherwise disposing of, any of BTG's assets or cash up to the value of $15,453,548, other than in the ordinary course of business, without first paying the same amount to [C-H]." This iteration shows that what C-H really wanted was a freeze order — and freeze orders directed at unspecified assets typically are in the nature of preliminary injunctions. See, e.g., FTC v. H. N. Singer, Inc., 668 F.2d 1107, 1112 (9th Cir. 1982) (noting that while an asset freeze can have "an effect comparable to that of an

attachment, it is not an attachment," but is an injunction).  The freeze order that C-H sought is no exception.

Teradyne buttresses this reading of the record.  In that case, the district court entered an order enjoining the defendant from disposing of $4,000,000 worth of assets and requiring it to set that amount aside in an interest-bearing account to ensure satisfaction of any future judgment or arbitration award that might eventuate in an ongoing dispute between the parties.  797 F.2d at 44-45.  We held that such an order should be treated as an injunction, id. at 47, and the factors to which we attached weight are equally present here.[2]  First, the requested relief in that case, as here, did not involve posting a bond or surrendering specified property, but, rather, contemplated compelling a party to act and/or refrain from acting.  Id. at 46.  Second, there, as here, the district court and the parties treated the requested relief as a preliminary injunction.  Id.  Third, and finally, the Teradyne court thought tying up a large chunk of funds pending the uncertain outcome of arbitration to be a "significant constraint." Id.  That consideration is magnified here, as C-H seeks to restrict the use of almost four times as much money pending the outcome of litigation.

---

[2]The directive to escrow funds in a separate account represents the only qualitative distinction between the order sought in Teradyne and the order sought in this case.  We see this as a distinction without a legally significant difference.

Because we find the relief requested here to be in the nature of an injunction, pure and simple, we need not probe the applicability of the collateral order doctrine. See supra note 1. It suffices to say that, after independent review of the record, we are confident that we have jurisdiction to hear and determine this interlocutory appeal. See 28 U.S.C. § 1292(a)(1).

## III.  STANDARD OF REVIEW

We ordinarily review the grant or denial of a motion for preliminary injunctive relief for abuse of discretion. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996) (Ross-Simons I).  This is a deferential standard of review, and the deference that it entails is most appropriate with respect to issues of judgment and the balancing of conflicting factors. See Cablevision of Boston, Inc. v. Pub. Improvement Comm'n, 184 F.3d 88, 96 (1st Cir. 1999).  Even then, however, appellate courts must be careful to ensure that deference does not mutate into blind allegiance.  The trial court's discretion is not unbridled and "[a]buse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." Indep. Oil & Chem. Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988).

-12-

We review the district court's answers to abstract questions of law de novo. Goya Foods, Inc. v. Wallack Mgmt. Co., 290 F.3d 63, 71 (1st Cir.), cert. denied, 537 U.S. 974 (2002). An error of law is, of course, always an abuse of discretion. Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003).

## IV. THE MERITS

Before sorting through the thicket of competing arguments, we note — and put to one side — an issue that is not squarely presented. Although this is a diversity case, C-H's motion explicitly invoked Fed. R. Civ. P. 65(a). As a result, the district court based its decision on that rule and, more generally, on federal equitable principles. In briefing this appeal, C-H has eschewed any argument that the availability of injunctive relief should be determined, in the first instance, by reference to the tenet that the law of the forum state supplies the rule of decision in diversity cases. See generally Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); see also Grupo Mexicano, 527 U.S. at 318 n.3 (raising that possibility and reserving the question). We therefore deem any such claim waived. See Teamsters Union v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) (describing as "settled" the principle that, with only a very narrow band of exceptions, "legal theories not raised squarely in the lower court cannot be broached for the first time on appeal"); Clauson v.

-13-

Smith, 823 F.2d 660, 666 (1st Cir. 1987) (similar).  Given this waiver, our decision necessarily hinges on principles of federal law.

### A.  **Framing the Issue**.

In some situations, federal courts possess general equitable power to issue prejudgment injunctions in the nature of freeze orders so as to ensure the adequacy of postjudgment remedies.  See United States v. First Nat'l City Bank, 379 U.S. 378, 385 (1965); DeBeers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 220 (1945).  The fact that such an order may be within the raw power of a federal court does not end the inquiry, but simply sets the stage for two further queries.  The logically antecedent question involves whether, categorically speaking, a particular case is of a type in which such an order may be issued. The second involves the proper legal standard to be employed in the exercise of that power.

The first of these questions is extremely complex.  In Grupo Mexicano, the Supreme Court held that the district court "had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages" where no preexisting lien or equitable interest had been claimed. 527 U.S. at 333.  It is unclear whether Grupo Mexicano directly controls this case.  On the one hand, its rationale favors the conclusion that the district

-14-

court lacked the inherent authority to grant the relief that C-H solicited. See, e.g., id. at 318-27 (finding that federal courts ordinarily lack the equitable authority to issue prejudgment attachments in actions at law). On the other hand, the application of the Grupo Mexicano rationale here would entail an extension of the Court's holding. After all, it is at least arguable that the existence of a security interest (such as C-H possesses) is a salient distinction.

Fortunately, we have the luxury of being able to leave this question for another day. Thus, we assume for argument's sake that the district court had the authority to grant the relief requested — a preliminary injunction in the nature of a freeze order. This assumption enables us to proceed directly to the second question and decide what legal standard governs the exercise of that assumed power.

### B. **Choosing the Standard**.

It is familiar lore that the issuance of a preliminary injunction depends on the outcome of a four-part inquiry. See, e.g., Ross-Simons I, 102 F.3d at 15; Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991). C-H asseverates that this inquiry is inapropos here because a federal court must apply state attachment standards to motions seeking prejudgment freeze orders. As best we can decipher its asseveration, C-H seems to be saying that, in cases where the relief sought is in the nature of an

equitable attachment, Fed. R. Civ. P. 65 should be read in light of Fed. R. Civ. P. 64 and be construed as importing state-law standards for determining the availability of relief.[3] BTG disagrees. It maintains that this case is a prototypical Rule 65 case — no more and no less — and that, therefore, the usual four-part test pertains.

To begin, circuit precedent suggests the use of the traditional four-part standard. In Teradyne, 797 F.2d at 51-57, we applied this standard in very similar circumstances (albeit without focused discussion). So too Unisys Corp. v. Dataware Products, Inc., 848 F.2d 311 (1st Cir. 1988), in which we found that the disputed order resembled an injunction and applied the same quadripartite test. Id. at 314.

C-H attempts to blunt the force of these precedents by arguing, first, that the decision to utilize the four-part standard

_____

[3]Rule 64, with exceptions not relevant here, provides:

> At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held . . . . The remedies [] available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies. . . .

Fed. R. Civ. P. 64.

-16-

in <u>Unisys</u> was not part of the court's holding (a point that, for argument's sake, we are willing to assume); and second, that <u>Teradyne</u> should be read narrowly. To that end, C-H declares that the <u>Teradyne</u> court recognized the availability of an alternative equitable attachment standard. But that ipse dixit misreads the opinion: the <u>Teradyne</u> court discussed the alternative of equitable attachment only in considering the appealability of the lower court's order. <u>See</u> <u>Teradyne</u>, 797 F.2d at 45-47. Having determined (as have we) that the requested relief was really in the nature of an injunction, the court went on to apply the traditional four-part test in a straightforward and unequivocal manner. <u>See</u> <u>id.</u> at 51-52. There are no two ways about it; <u>Teradyne</u> stands four-square for the proposition that a prejudgment freeze order is in the nature of an injunction and that, therefore, its propriety should be analyzed under the traditional four-part test.

C-H next seeks to minimize the impact of these precedents by citing to decisions of other courts. This is wasted motion. The rule is firmly settled that, in a multi-panel circuit, a newly constituted panel is bound by prior panel decisions directly on point. <u>See</u> <u>Jusino</u> v. <u>Zayas</u>, 875 F.2d 986, 993 (1st Cir. 1989). Although there are two well-defined exceptions to this rule, <u>see</u>

<u>Williams</u> v. <u>Ashland Eng'g Co.</u>, 45 F.3d 588, 592 (1st Cir. 1995), neither applies here.[4]

In all events, the precedents that C-H marshals are not persuasive. A clear majority of courts confronting similar circumstances have approved the use of the traditional four-part preliminary injunction standard. <u>See</u>, <u>e.g.</u>, <u>United States ex rel. Taxpayers Against Fraud</u> v. <u>Singer Co.</u>, 889 F.2d 1327, 1331 (4th Cir. 1989); <u>EBSCO Indus., Inc.</u> v. <u>Lilly</u>, 840 F.2d 333 (6th Cir. 1988); <u>Newby</u> v. <u>Enron Corp.</u>, 188 F. Supp. 2d 684, 707 (S.D. Tex. 2002); <u>cf.</u> <u>Deckert</u> v. <u>Ind. Shares Corp.</u>, 311 U.S. 282, 290 (1940) (finding injunction reasonable because available remedies at law would be inadequate). Although most of these decisions have applied this standard without any developed analysis of the issue that C-H advances here, <u>see</u>, <u>e.g.</u>, <u>Singer Co.</u>, 889 F.2d at 1330-31, resort to that standard makes eminently good sense in this context.

With the exception of a pair of Eleventh Circuit cases — to which we shall return — the precedents to the contrary comprise isolated district court rulings. To the extent that these cases apply state standards rather than the traditional four-part test to

---

[4]The first exception provides that a panel decision may be "undermined by controlling authority, subsequently announced," such as a decision of the Supreme Court or of the circuit court sitting en banc, or a statutory overruling. <u>Williams</u>, 45 F.3d at 592. The second pertains to those rare instances in which authority that postdates the original decision "offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind." <u>Id.</u>

determine the availability of preliminary injunctive relief under Rule 65, <u>see</u>, <u>e.g.</u>, <u>Hasbro, Inc.</u> v. <u>Serafino</u>, 958 F. Supp. 19, 22-23 (D. Mass. 1997); <u>Anderson Foreign Motors, Inc.</u> v. <u>New Engl. Toyota Distrib., Inc.</u>, 475 F. Supp. 973, 978 (D. Mass. 1979), we regard them as wrongly decided. Moreover, they are not fairly representative of the genre. <u>See</u>, <u>e.g.</u>, <u>Hunter</u> v. <u>Youthstream Media Networks, Inc.</u>, 241 F. Supp. 2d 52, 54 (D. Mass. 2002) (applying the traditional four-part preliminary injunction standard in analogous circumstances).

We turn now to the Eleventh Circuit cases hawked by C-H. <u>See</u> <u>Rosen</u> v. <u>Cascade Int'l, Inc.</u>, 21 F.3d 1520 (11th Cir. 1994); <u>Mitsubishi Int'l Corp.</u> v. <u>Cardinal Textile Sales, Inc.</u>, 14 F.3d 1507 (11th Cir. 1994). Those opinions contain language which, at first blush, might be read to suggest that the Eleventh Circuit follows a rule opposite to that formulated in <u>Teradyne</u>. <u>See</u>, <u>e.g.</u>, <u>Mitsubishi</u>, 14 F.3d at 1521-22 (stating that "Rule 64, and not Rule 65 . . . provides the standard for evaluating a request for preliminary injunctive relief that is, in reality, no more than a request for a prejudgment attachment"). Taken in context, however, this language does not betoken an irreconcilable conflict.

In <u>Rosen</u>, the Eleventh Circuit made clear that district courts had no power under Rule 65 to issue a preliminary injunction that amounts to a prejudgment attachment when the underlying action seeks only monetary damages and no statute specifically authorizes

-19-

ancillary prejudgment relief. Rosen, 21 F.3d at 1529. The focus of the case at hand is different (although we are sympathetic to Rosen's core holding, we do not need to pass upon that question here). Furthermore, both Rosen and Mitsubishi dealt with assets that seem to have been located within the forum state (a circumstance that, as C-H has acknowledged, is absent here). For that reason, the district court in each case actually was applying Rule 64, not Rule 65. Nothing in either decision fairly can be read to support the notion that state standards govern the determination of when a federal court, acting under Rule 65, can issue an injunction in the nature of a freeze order designed to affect assets located outside the forum state.

C-H has a fallback position. It observes that Grupo Mexicano, 527 U.S. at 330-31, explicitly preserves the availability of state-law remedies. This is true as far as it goes — but it does not take C-H very far. In those few sentences, the Grupo Mexicano Court explained that a freeze order related to property in which the putative creditor possessed no legal or equitable interest essentially amounted to a prejudgment attachment. The Court then stated that allowing such relief in an action seeking only remedies at law "could render Federal Rule of Civil Procedure 64, which authorizes use of state prejudgment remedies, a virtual irrelevance." Id. at 330. The Court's reasoning supports the continued vitality of Rule 64 — but the mere fact that state

-20-

attachment standards remain applicable in federal courts under Rule 64 tells us nothing about the wonted operation of Rule 65. C-H is not seeking an attachment under Rule 64, and it has identified no property that is subject to the district court's in rem jurisdiction.

At the expense of carting coal to Newcastle, we add that the very nature of a freeze order counsels against commingling the jurisprudence of Rule 65 with that of Rule 64. Even though a freeze order may serve many of the same ends as an attachment, the former acts upon a party whereas the latter is directed at specific property. Restraining (or compelling) individual action is especially strong medicine, and courts should hesitate to issue such orders on an interlocutory basis without a showing of urgent need. The traditional four-part standard for preliminary injunctive relief provides a prophylaxis against the hasty or intemperate use of that power. Consequently, sound policy considerations support the imposition of that standard in connection with freeze orders.

To say more would be to paint the lily. We hold that the traditional four-part preliminary injunction standard applies in full flower to motions brought under Rule 65 in hopes of securing prejudgment freeze orders.

## C. **Applying the Discerned Standard**.

This brings us to the final leg of our journey.  Having concluded that the district court appropriately resorted to the traditional four-part standard for preliminary injunctive relief en route to its alternative holding, the question reduces to the supportability of the court's determination that C-H failed to achieve that benchmark.  Upon close perlustration, we find no fault with that determination.

Under the accepted framework, the four elements that a district court faced with a motion for a preliminary injunction must assess are the following:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Ross-Simons I, 102 F.3d at 15.  In conjunction with the use of this standard, trial courts have wide discretion in making judgments regarding the appropriateness vel non of preliminary injunctive relief.  Id. at 16.

In most cases — and the case at hand is no outlier — irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief.  Matos v. Clinton Sch. Dist., ___ F.3d ___, ___ (1st Cir. 2004) [No. 03-1332, slip op. at 8]; accord Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d

-22-

8, 13 (1st Cir. 2000) (describing irreparable harm as "an essential prerequisite" for receiving such redress). The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant. Ross-Simons I, 102 F.3d at 18.

In this case, the district court found that C-H had failed to carry that burden. This finding draws substantial comfort from the record. A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store. Regan v. Vinick & Young (In re Rare Coin Galleries of Am., Inc.), 862 F.2d 896, 902 (1st Cir. 1988). Here, we have been unable to discern anything resembling a realistic prospect of irreparable harm.

Irreparable harm most often exists where a party has no adequate remedy at law. See Rosario-Urdaz, 350 F.3d at 221. In this case, C-H ultimately seeks an award of pecuniary damages (and, in a best case scenario, that is all it will be entitled to receive). Such an award will make it whole.[5] Accordingly, its legal remedy is adequate.

To escape the ineluctable conclusion that it cannot show a meaningful risk of irreparable harm, C-H asserts that a denial of

---

[5]We note that, under Massachusetts law, C-H will be entitled to prejudgment (and perhaps even all post-breach) interest. See Mass. Gen. Laws ch. 231, § 6C.

preliminary injunctive relief will allow "BTG to enjoy the fruits of [C-H's] investment in the company without any reciprocal obligations." Appellants' Reply Br. at 22. This assertion begs the question. At any rate, it is more properly viewed in addressing the likelihood of success on the merits (an issue that we need not reach). C-H has not yet proven its mettle. If and when it does (by prevailing on the merits of its claim), it will be entitled to execute upon the judgment entered against BTG. Unless and until that happens, C-H must identify some independent reason why it will be irreparably harmed without the imposition of interim relief.

In a second offer to show irreparable harm, C-H posits that it is not able to monitor its admittedly substantial investment and that, therefore, it "face[s] the risk that [it] will be left with nothing at the end of the day." Appellants' Reply Br. at 22. That sort of statement can be made by virtually every person who sues another for money damages. Its very ubiquity indicates why it cannot conceivably be enough to justify the issuance of a prejudgment injunction of this nature. The case law so holds. See, e.g., In re Rare Coin Galleries, 862 F.3d at 902; Public Serv. Co. of N.H. v. Town of W. Newbury, 835 F.2d 380, 383 (1st Cir. 1987); see also Ross-Simons I, 102 F.3d at 19 (explaining that a "tenuous or overly speculative forecast of anticipated harm"

does not possess the substance required to show irreparable injury).

Two further points seem worthy of mention. First, C-H's cries of urgency are sharply undercut by its own rather leisurely approach to the question of preliminary injunctive relief. It waited more than a year after the commencement of the action to seek an injunction. That chronology has evidentiary significance: delay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm. See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 295 F. Supp. 2d 366, 390 (S.D.N.Y. 2003). The longer the delay, the more pervasive the doubt.

Second, even assuming that there is a risk that BTG will be unable to pay a future judgment — a conclusion that has utterly no footing in the record — the Agreement granted C-H a security interest in all of BTG's property. C-H's counsel conceded at oral argument that this security interest has been perfected. Thus, C-H — unlike an ordinary plaintiff — has an alternative means for ensuring payment of any judgment that it eventually might obtain. The existence of this anchor to windward further undermines C-H's argument that it is facing an intolerable risk of irreparable harm.

A preliminary injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate

interests. The instant record reflects no basis for a reasoned belief that such an order is necessary. Accordingly, we hold that the district court acted well within the encincture of its discretion in denying a preliminary injunction on the ground that C-H had failed to make the requisite showing of irreparable harm.[6] Cf. Ross-Simons I, 102 F.3d at 19 (noting that, in appeals relating to preliminary injunctions, "battles over the quality and quantity of the harm alleged most often will be won or lost in the trial court").

## V. CONCLUSION

We need go no further. To the extent a party seeks a preliminary injunction under Rule 65, the traditional four-part standard governs — and this remains so notwithstanding that the sought-after injunction is in the nature of an equitable attachment or freeze order. Because the district court applied the appropriate legal standard and because its ensuing determination — that, on the facts of this case, C-H had made no showing of irreparable harm — was not an abuse of discretion, we uphold its ukase.

**Affirmed**.

---

[6]In view of this conclusion, we need not address the other three prongs of the traditional four-part standard.